In the Interest of A.S. a/k/a A.P.S., A Minor.

Appeal of K.S., Father.

In the Interest of W.S., A Minor.

Appeal of K.S., Father.

Superior Court of Pennsylvania.

Submitted July 12, 2010.

Filed Sept. 9, 2010.

Jason M. Leon, Stroudsburg, for appellant.

Lori J. Cerato, Stroudsburg, for A.S. and W.S., appellees.

A.S., mother, Participating Party, Pro Se.

Elizabeth B. Weekes, Stroudsburg, for Children and Youth, Participating Party.

BEFORE: ALLEN, MUNDY, and KELLY, JJ.

OPINION BY ALLEN, J.:

In these consolidated appeals, K.S. ("Father") appeals from the orders involuntarily terminating his parental rights to his two minor children, A.S. (d.o.b. 7/6/08) and W.S. (d.o.b. 7/3/09), (collectively, "Children"), pursuant to the Adoption Act. We affirm.

Father and Children's mother ("Mother") initially came to the attention of the Monroe County Children and Youth Services ("CYS") in August of 2006, prior to Children's birth, when referrals were made regarding two older siblings, K.S. and S.S.[1]

CYS subsequently provided a multitude of services to the parents to address issues of poor parenting, lack of employment, lack of housing, lack of income and other issues that plagued the parents for a number of years. A.S. was born on July 6, 2008, during the dependency of the older children. Mother did not receive prenatal care prior to A.S.'s birth. At the time of her birth, Mother and Father were residing in a trailer. CYS conducted a home assessment on July 8, 2008, and it was determined that the home was sufficiently appropriate for A.S., as long as she was not mobile.

In the fall of 2008, Mother and Father were arrested on bench warrants for non-payment of child support. Safety concerns again arose regarding the condition of the family's home. Mother and Father advised CYS that they intended to move to Georgia. In December, Father was arrested in Wayne County, Pennsylvania, and incarcerated for various motor vehicle violations, including operating a vehicle without a license. While Father was incarcerated, the condition of the family's mobile home deteriorated, and a hole developed in the floor of the trailer, causing the kitchen floor to sink to the ground.

On February 3, 2009, the CYS caseworker attempted to make a home visit at a residence that the family had moved to in Stroudsburg. Father and Mother refused to allow the caseworker to enter the home and alleged that they did not have permission to permit the caseworker's entry since it was not their home. While the family lived in the Stroudsburg residence, their trailer continued to deteriorate further in condition, without water and operational plumbing.

CYS sought an adjudication of dependency relative to A.S. and, on March 12, 2009, the trial court adjudicated A.S. dependent. Initially, A.S. remained in the care of Father and Mother. However, Father was once more incarcerated from March 12, 2009 until April 28, 2009. During this time, CYS had difficulty locating

1. This Court ultimately affirmed the change of goal to adoption for the older siblings, not subject to this appeal, in an unpublished memorandum filed on November 18, 2008, at No. 559 EDA 2008. In that memorandum, this Court reasoned "[i]t would not only be inappropriate, but it would also be irresponsible to place the Children in the care of a man who has, so far, proven himself incapable of providing a secure income for himself and who exhibits a continuing disregard for his responsibilities to his Children and to society." *Id.* at 9–10. Despite extensive support from CYS, Mother and Father were unable to adequately care for the older children and the parents' rights to the older siblings were terminated in March of 2009.

Mother and A.S. On April 9, 2009, Mother contacted CYS because the family had lost their trailer due to non-payment of rent. On that same day, CYS placed A.S. in foster care.

On April 18, 2009, the trial court held a permanency hearing and CYS requested a finding of aggravating circumstances based on the two previous terminations of Father's and Mother's parental rights to their older children. The trial court granted the request.

On July 3, 2009, Mother gave birth to W.S. Mother did not obtain prenatal care prior to the birth. At the time, CYS had received several referrals regarding the family, alleging that Mother was in labor and Father was unable to take her to the hospital, and claiming that Mother was living in a shed with no electricity or bathroom.

On July 6, 2009, CYS took emergency custody of W.S. and placed him in foster care. The trial court held a permanency review hearing on July 16, 2009, at which time the trial court determined W.S. to be dependent and made a finding of aggravated circumstances.

CYS filed separate petitions for the termination of Father's parental rights to Children on November 4, 2009.[2] In separate orders entered on February 22, 2010, the trial court terminated Father's parental rights to Children pursuant to 23 Pa. C.S.A. § 2511(a)(1), (2), (5), and (b). Father filed timely notices of appeal on March 23, 2010. On the next day, Father filed concise statements of errors complained of on appeal.[3]

On appeal, Father raises three issues:

1. Was it error to terminate the parental rights of [K.S.], with respect to A.S. and W.S. when W.S. had only been in care for seven months at the time of the hearing and [A.S.] had only been in care for ten months and the family had made progress towards resolving their temporary housing problem?

2. Did the Court place an undue amount of weight on the prior history of the family in deciding whether termination was appropriate especially considering that A.S. had lived with the family during the first 11 months of her life and was well[-]cared for during that time, and W.S. had only been in care for seven months at the time of the hearing?

3. Was the termination petition filed prematurely as W.S. had not yet been in care for six month[s] at the time of the filing of the petition?

Father's Brief at 6.

 Our standard of review regarding orders terminating parental rights is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of dis-

---

**2.** CYS also sought termination of Mother's parental rights to Children, which the trial court subsequently granted.

**3.** Although Father failed to comply with Pa. R.A.P. 1925(a)(2)(i), relating to children's fast track appeals, we decline to dismiss or quash his appeal. *See In Re K.T.E.L*, 983 A.2d 745 (Pa.Super.2009) ("the failure to file a concise statement of errors complained of on appeal with the notice of appeal will result in a defective notice of appeal, to be disposed of on a case by case basis."). Herein, Father filed the Rule 1925(b) statements one day after filing the notices of appeal. However, since the misstep was not prejudicial to any of the parties and did not impede the trial court's ability to issue a thorough opinion, the procedural error was harmless.

cretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa.Super.2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *Id.* at 806. We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super.2003).

 The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73–74 (Pa.Super.2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super.2003).

The applicable statutory bases for termination are as follows:

§ 2511. Grounds for involuntary termination

(a) General rule.—The rights of a parent in regard to a child may be termi-nated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an Agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such

as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to Sections (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (b).

"[A] parent's basic constitutional right to the custody and rearing of . . . [his] children is converted, upon the failure to fulfill . . . parental duties, to the children's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa.Super.2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). There is a recognized connection between Pennsylvania law on termination of parental rights and the Adoption and Safe Families Act ("ASFA"), the stated policy of which is:

> To remove children from foster placement limbo where they know neither a committed parent nor can [they] look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family. . . . States such as Pennsylvania, which participate in the program, are required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in the

Adoption and Safe Families Act of 1997. Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*In re G.P.-R.*, 851 A.2d 967, 975–76 (Pa.Super.2004) (quoting *In re B.L.L.*, 787 A.2d 1007, 1016 (Pa. Super. 2001) (some internal citations and quotation marks omitted). "[T]his act was designed to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to long term foster care or returning them to abusive families." *In re C.B.*, 861 A.2d 287, 295 (Pa.Super.2004), *appeal denied*, 582 Pa. 692, 871 A.2d 187 (2005).

■ In his first two issues on appeal, Father alleges that his "situation" was caused mostly by a lack of housing and several setbacks that were not of his own doing. Father claims that he paid the deposit and made additional rental payments towards the purchase of the trailer, but that the seller did not transfer title. Father alleges that, because of the short period of time that Children were removed from his care, he was not afforded a sufficient opportunity to remedy the housing situation that led to the removal of Children. Father asserts that the trial court additionally placed undue weight on the family's prior history in deciding whether termination was appropriate. Father reiterates that Children were not removed from his care for a lengthy amount of time.

■ This Court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In Re B.L.W.*,

843 A.2d 380, 384 (Pa.Super.2004) (*en banc*), *appeal denied,* 581 Pa. 668, 863 A.2d 1141 (2004). Accordingly, for the purpose of this appeal, we focus our review on Section 2511(a)(2).

The fundamental test in termination of parental rights under Section 2511(a)(2) was stated in *In re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) ... such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) ... the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley,* 719 A.2d 327, 330 (Pa.Super.1998).

At the termination hearing, Jennifer Payne–Fetherman, a CYS caseworker assigned to the family, testified. N.T. 2/19/10. Ms. Payne–Fetherman stated that Father and Mother have an extensive history with CYS, including the termination of their rights to two older children in March of 2009. *Id.* at 7. She relayed that the family has consistently had issues with suitable housing. The family had kerosene heaters and tool boxes on the front porch, in the reach of Children. *Id.* at 11. Additionally, Ms. Payne–Fetherman testified that both parents had criminal histories, resulting in their recurring incarceration. *Id.* at 13–14. Specifically, Father was incarcerated for driving with a suspended license and without a valid registration and inspection, and for driving a vehicle without insurance. *Id.* at 13. While Father was incarcerated, Mother lived with a family friend because there was no heat in the family's trailer. *Id.* at 14. Eventually, the condition of the trailer deteriorated to a point where the kitchen

floor was sinking into the ground. *Id.* at 15. Ms. Payne–Fetherman testified that she attempted to schedule home visits at the friend's house where the family was living in Stroudsburg. *Id.* at 16. However, Father and Mother would not let her into the home, stating that they did not have permission from the home's owner. *Id.* When Father and Mother moved back to the trailer, the conditions were still unsuitable, *i.e.,* the house smelled of kerosene; there was damage to the trailer floor; and garbage and kerosene were on the porch. *Id.* at 17.

Ms. Payne–Fetherman stated that, in March of 2009, Father was again incarcerated. At that time, CYS was unable to locate Mother and the children. *Id.* at 19. There was a domestic relations hearing scheduled for March 19, 2009, and Mother did not attend, resulting in a warrant for her arrest. *Id.* On April 9, 2009, Mother finally contacted CYS with concerns regarding Father's release from jail. Mother went to CYS offices where she was arrested based on the outstanding warrant. *Id.* at 20. A.S. was placed in foster care at this time.

Ms. Payne–Fetherman testified that, on July 3, 2009, CYS received another referral alleging that Mother was in labor with no transportation to the hospital. The referral also stated that Mother was living in a shed with no electricity. *Id.* at 22. Subsequently, the hospital contacted CYS after Mother gave birth to W.S. on July 5, 2009. The next day, CYS placed W.S. into emergency foster care. *Id.* at 24.

Ms. Payne–Fetherman detailed Father's parental incapacity following the placement of Children in foster care. For example, Father missed Children's doctors' appointments. *Id.* at 25. Father informed CYS that he was working, but he had no pay stubs to prove his employment. *Id.* at 27. Father alleged to Ms. Payne–Fether-

man that he had resolved his criminal situation, but he was unable to substantiate this claim when a review of Father's criminal status revealed that he owed $2,794.23 in fines, and had approximately six open criminal cases. *Id.* at 34. As for parenting classes, Father informed CYS that they were too expensive. *Id.* at 27. Ms. Payne–Fetherman stated that Father was unable to provide her with proof of car inspection, registration, and insurance. *Id.* at 36. Despite not having a license, Ms. Payne–Fetherman reported that Father "drives away from the visits and I have witnessed every single one of them." *Id.* at 35–36. Furthermore, Father failed to undergo a mental health evaluation as requested by CYS. *Id.* at 58.

Ms. Payne–Fetherman testified that Father and Mother continued to reside at their friend's residence in Stroudsburg. She stated that she "asked them over and over again" to view the home for an assessment. *Id.* at 32. However, Father and Mother refused. *Id.* at 32. Ms. Payne–Fetherman relayed that the owner of the home recently passed away, and that it was her understanding that his estate was selling the property. *Id.* 44. In sum, Ms. Payne–Fetherman provided comprehensive testimony of Father's continued incapacity to parent A.S. and W.S.

Father also testified at the termination hearing. He stated that he purchased a trailer for the family and reserved a lot in order to provide suitable housing for Children. Father explained that the seller of the trailer did not hold good title, and, eventually, the money he paid to the seller was recouped through the Attorney General's office. *Id.* at 68. Father testified that he receives social security disability checks every month, and that he expected his social security income to increase to $703 dollars per month. As to his housing needs, Father testified that he intended to move to Jersey City, New Jersey, closer to his mother. The apartment Father planned to rent costs $875 per month. When questioned about how he intended to pay for an apartment that costs $875 per month when he was only receiving $705 in income, Father responded that "down in the city there's money to be made." *Id.* at 76.

This Court's review of the testimony supports the trial court's termination of Father's parental rights relative to Section 2511(a)(2). Beginning in 2006, Father has demonstrated a consistent failure to provide his children with a suitable home. Father's repeated refusal to comply with vehicle laws resulted not only in multiple incarcerations, but also the levying of large fines. This Court is cognizant of the fact that incarceration alone cannot constitute grounds for termination. However, Father's failure to comply with the laws of the Commonwealth has created a situation and an environment that has left Children without the necessary care they require. In short, Father's recurrent incarceration is evidence of his parental incapacity. Furthermore, due in part to the extensive fines that Father faced for his continuous unlawful behavior, he was unable to pay for parenting classes or maintain suitable housing for the family. As noted by the CYS caseworker, Father continued to operate his vehicle to and from visitation without the proper inspection and registration, thus defying the law and perpetuating the circumstances that lead to his incarceration and Children's placement. This pattern of behavior supports the trial court's conclusion that Father has refused to remedy the conditions that led to Children's placement, per Section 2511(a)(2). *See In re Adoption of W.J.R.,* 952 A.2d 680, 687 (Pa.Super.2008) (holding that a father's repeated pattern of criminal activity and failure to comply with goals of an agency satisfied requisite incapacity, abuse, ne-

glect, or refusal to parent relative to Section 2511(a)(2)); *see also In re Z.P.*, 994 A.2d 1108 (Pa.Super.2010) (holding that, as the father's future with respect to adequate housing and employment was indefinite, termination pursuant to Section 2511(a)(2) was proper).

In *In re E.A.P.*, 944 A.2d 79 (Pa.Super.2008), this Court explained:

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and *strong, continuous parental ties*, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.... Further, grounds for termination under subsection (a)(2) are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental duties.

*Id.* at 82 (quotation marks and citations omitted). "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." *Id.* at 83 (quotation marks and citation omitted).

With the above legal tenets in mind, we reject Father's claims that his housing issues were out of his control due to a faulty title transfer. Father's failure to provide adequate housing for Children extends beyond this particular instance. For nearly three years, CYS informed Father of concerns regarding the condition of the family's trailer. During the time periods when the family lived in Stroudsburg, Father was uncooperative in permitting CYS to conduct a home assessment, alleging that he could not permit CYS entry into a home that he did not own. The certified record provides no indication that Father endeavored to arrange a home assessment. Certainly, these are the type of "obstacles" this Court considered in *In re E.A.P., supra.*

Rather than addressing his parenting deficiencies, Father testified that he plans to relocate to New Jersey. The trial court properly discredited Father's plans for relocation, as they lacked a reasonable degree of forethought necessary to provide Children with permanency and security. Specifically, Father testified that he expected to receive $705 dollars per month in disability, but intended to rent an apartment that costs $875. Father had no concrete plan for making up the difference in the rent, nor did he factor in the costs of other life necessities, including utilities, food, and transportation. Accordingly, the trial court was well within its discretion in discrediting Father's testimony that he would be able to care for Children in New Jersey. *See In re M.G.*, 855 A.2d at 73–74 (stating that the trial court is free to resolve all credibility determinations).

■ · Father additionally claims that the abbreviated period of time in which CYS had custody of Children did not provide him with sufficient opportunity to remedy the issues that led to Children's placement. We note that, unlike Sections (a)(1), (5), and (8), Section 2511(a)(2) does not provide a statutory time constraint on termination. Rather, Section 2511(a)(2) addresses situations where remedial aid by an agency is not required, *i.e.* when there is a finding of aggravated circumstances, as in the matter *sub judice.* Here, Father's inability to parent predates Children's birth, where CYS's involvement with the family began

in 2006. The scope of CYS's involvement with the family indicates that Father has been and remains unable or unwilling to remedy the conditions that led to Children's placement. In light of the aggravating circumstances of the case, *i.e.* the prior termination of Father's rights to his older children, coupled with Father's continuous failure to provide a habitable environment and consistent parenting for these Children, termination pursuant to Section 2511(a)(2) was proper.

In his third issue, Father alleges that the termination petition concerning W.S. was filed prematurely as to Section 2511(a)(1) and (5) because W.S. was not in the care of CYS for six months at the time of the filing of the petition and was only four months old.

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. *In re C.S.*, 761 A.2d at 1201. The court should consider the entire background of the case and not simply:

> ... mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his ... parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d at 855.

In this case, CYS filed its termination petition when W.S. was only four months old. Since the six-month time requirement of Section 2511(a)(1) was not met, as evidenced by W.S.'s age, termination relative to this section was improper.

In order for termination pursuant to Section 2511(a)(5) to be proper, the following must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1273–1274 (Pa.Super.2003).

We find that the trial court committed an error of law in terminating Father's parental rights pursuant to Section 2511(a)(5) in light of the six-month time requirement of the subsection. As noted *supra*, at the time of the filing of the petition, W.S. had only been in CYS care for the four short months of his life. Although the trial court's finding of aggravated circumstances permits CYS to forgo remedial aid, the time requirement of Section 2511(a)(5) is statutorily mandated. Accordingly, the trial court erred in terminating Father's parental rights to W.S. based on Section 2511(a)(5).

We additionally note that, unlike Section 2511(a)(2), Section 2511(a)(5) evaluates the likelihood that services provided to a parent will remedy the conditions which led to the child's removal. *See In re Adoption of M.E.P, supra.* The record reflects that during the initial months of A.S.'s dependency, prior to the birth of W.S., CYS provided the family with services in order to facilitate the possibility of reunification. However, those services ceased upon the trial court's finding of aggravated circumstances, prior to the birth of W.S. There-

fore, the family did not receive services from CYS during the lifetime of W.S. As such, there is no potential to evaluate whether "the services or assistance reasonably available to the parent [were] not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time." 23 Pa.C.S.A. § 2511(a)(5). Thus, we conclude that Section 2511(a)(5) is inapplicable to the involuntary termination of a parent's rights to a child when an agency did not provide services to the family. For this reason, it was error for the trial court to involuntarily terminate Father's parental rights to W.S. relative to Section 2511(a)(5).

Nonetheless, we reiterate that this Court need only agree with the trial court on one ground relative to Section 2511(a) in order to affirm the termination of parental rights. *In Re B.L.W., supra.* As termination pursuant to Section 2511(a)(2) is properly supported by the certified record and applicable law, Father's remaining issue is moot.

Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b). *In re D.W.,* 856 A.2d 1231, 1234 (Pa.Super.2004). Although both subsections of the statute reference the "needs and welfare of the child," Sections 2511(a) and (b) require separate analyses. *In re I.G.,* 939 A.2d 950, 951 (Pa.Super.2007).

This Court has held that the trial court is not required by statute or precedent to order that a formal bonding evaluation be performed by an expert. *In re K.K.R.-S.,* 958 A.2d 529, 533 (Pa.Super.2008). In *In re K.Z.S.,* 946 A.2d 753 (2008), this Court stated that there are some instances where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child. *Id.,* 946 A.2d at 762. This Court explained that, in cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. *Id.* at 763. "The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *Id.*

The *In re K.Z.S.* Court emphasized that, in addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child. *Id.*

■ At the termination hearing, the CYS caseworker testified that A.S., at nineteen months old, was well-adjusted in her pre-adoptive home, where she was placed when she was nine months old. N.T., 2/19/09, at 60–61. W.S., who has lived with his pre-adoptive foster family his entire life, is also very happy and loved by his foster family. *Id.* at 62.

In addition to this testimony, the trial court also considered Children's placement in foster care for almost their entire lives. The trial court's conclusion that there was no bond between Father and Children which, if severed would be detrimental to Children's best interests, is supported by clear evidence of record. As in *In re K.Z.S.,* there was no need for CYS to present evidence of a bond evaluation conducted by an expert. The evidence of record overwhelmingly supports the trial court's conclusion that Father cannot provide the security, stability, and comfort

which Children require. Thus, the trial court did not commit an abuse of discretion in concluding that CYS had satisfied the requirements of section 2511(b). *See also In re A.R.M.F.*, 837 A.2d 1231 (Pa.Super.2003) (holding that the court properly terminated parental rights where the decision was based in part on the social worker's and caseworker's testimony that children did not share a significant bond with biological parents and were well-bonded with their foster parents).

After a careful review of the record, we find that there is competent evidence to support the trial court's decision to terminate Father's parental rights pursuant to § 2511(a)(2) and (b). Accordingly, we affirm the orders terminating Father's parental rights to Children.

Orders affirmed.