J-S39001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: E.R.A.G., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.G., | |
| | No. 3469 EDA 2014 |

Appeal from the Decree October 29, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000482-2013
CP-51-DP-0001614-2011

BEFORE:  BOWES, OTT AND MUSMANNO, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED JULY 29, 2015**

E.G. ("Father") appeals from the order entered on October 29, 2014, wherein the trial court involuntarily terminated his parental rights to his eight-year-old daughter, E.R.A.G.[1]  We affirm.

The following facts were gleaned from the certified record.  E.R.A.G. was born during January 2006.  Father has been incarcerated since February 17, 2011, and he was not involved in her care prior to placement.  On August 10, 2011, the Philadelphia Department of Human Services ("DHS") received a General Protective Services ("GPS") report alleging that then-five-

---

[1]  E.R.A.G.'s mother, C.S., voluntarily relinquished her parental rights.

year-old E.R.A.G. and her half-sibling were playing outside of the home unsupervised.  The GPS report also alleged, *inter alia*, that E.R.A.G. was dirty, slept outside while C.S. ("Mother") was away from the home, that the household lacked food, and that drug trafficking was occurring at the residence.  The report was ultimately substantiated.  The ensuing DHS investigation revealed that the home was infested with vermin. Food was stored in a hole in the bedroom wall, and E.R.A.G. and her half-sibling slept on a urine-soaked mattress on the floor.  On August 11, 2011, DHS removed E.R.A.G. from the home under the authority of an order of protective custody.

On September 1, 2011, the juvenile court adjudicated E.R.A.G. dependent pursuant to the Juvenile Act, 42 Pa.C.S. § 6302, and committed the child to DHS physical and temporary legal custody.  The court directed DHS to arrange a visitation schedule for Father at SCI-Coal Township and to invite him to participate in the ensuing Family Service Plan ("FSP") meeting by telephone.  Father remained incarcerated throughout his daughter's placement and was not released from confinement until after he filed the instant appeal from the order terminating his parental rights.

The original goal of the FSP was reunification.  Father's goals under the plan required him to submit to evaluations addressing potential drug and alcohol abuse and his mental health, complete a parenting education course, comply with consistent visitation with E.R.A.G., participate in his daughter's

permanency planning, and maintain contact with DHS. The goals were subsequently revised to include virtual visitation with E.R.A.G. at SCI-Coal Township, sending the child correspondence, and locating suitable housing for his impending release from prison.

Father's compliance was minimal. He initially mailed E.R.A.G. letters and photographs, and he requested virtual visitation with her. However, the correspondence was sporadic, and Father never completed the arrangements for the virtual visitations. In fact, due to his inaction for more than six months, prison administrators revoked his authorization to participate in the virtual visitation program. DHS offered to have his authorization reinstated, but Father declined. Allegedly due to what he believed would be his impending release, Father did not want to participate in that program. Unfortunately for Father, he was not released from incarceration until more than one year after the virtual visitations with E.R.A.G. would have commenced.

On October 28, 2013, DHS filed a petition to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a). Following a hearing on October 29, 2014,[2] the trial court terminated Father's parental rights to

---

[2] Despite being served notice of the proceedings, Father did not participate in the evidentiary hearing. Appointed counsel was unable to reach Father at SCI Coal Township. Marleah Harper, a DHS social worker, was the only witness to testify during the hearing. In order to conserve time, Father's
*(Footnote Continued Next Page)*

E.R.A.G. pursuant to 23 Pa.C.S. § 2511(a)(1), (2) and (b).[3]   This timely appeal ensued.   Father complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise statement of errors complained of on appeal simultaneously with his notice of appeal.

Father presents two issues for our review:

1.    Whether the trial court found by clear and convincing evidence that [DHS] met its burden of proof that Father's parental rights should be terminated?

2.    Whether the trial court found by clear and convincing evidence that terminating Father's parental rights was in [E.R.A.G.'s] best interest[?]

Father's brief at 4.

We review the trial court's order to grant or deny a petition to involuntarily terminate parental rights for an abuse of discretion.   *In re C.W.U., Jr.*, 33 A.3d 1, 4 (Pa.Super. 2011).   "We are limited to determining whether the decision of the trial court is supported by competent evidence."

*(Footnote Continued)* _____

counsel stipulated that, if called by DHS, the caseworker assigned to the family would testify consistent with the statement of facts attached to the agency's petition to terminate Father's parental rights.

[3] The trial court initially terminated Father's parental rights based upon subsections (a)(1), (2), (5), and (8).   However, it subsequently concluded that reliance upon subsections (5) and (8) would be inappropriate due to the fact that Father was incarcerated when E.R.A.G. was initially placed in DHS custody.   We do not comment on the merits of the court's legal perspective beyond the observation that E.R.A.G. was placed in DHS care due to a lack of parental care and control, which was due, at least partially, to Father's continued incarceration.

*In re R.L.T.M.*, 860 A.2d 190, 191 (Pa.Super. 2004) (quoting *In re C.S.*, 761 A.2d 1197, 1199 (Pa.Super. 2000)). However, "[w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re C.W.U., Jr.*, *supra* at 4. As the ultimate trier of fact, the trial court is empowered to make all determinations of credibility, resolve conflicts in the evidence, and believe all, part, or none of the evidence presented. *In re A.S.*, 11 A.3d 473, 477 (Pa.Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id*.

The party petitioning for termination of parental rights "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203–04 (Pa. 1989).

Requests to involuntarily terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1)    The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
>             . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The test for terminating parental rights consists of two parts.  In *In re*

*L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007), we explained:

> Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.  One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 6 -

Herein, the certified record supports the trial court's determination that DHS established the statutory grounds to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). As it relates to §2511(a)(1), the pertinent inquiry for our review follows:

> To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. . . . Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

*In re D.J.S.*, 737 A.2d 283, 285 (Pa.Super. 1999) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)) (internal citations omitted). Although the six months immediately preceding the filing of the petition are the most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. *In re B.,N.M.*, 856 A.2d 847 (Pa.Super. 2004). Additionally, to the extent that the trial court based its decision to terminate parental rights pursuant to subsection (a)(1), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." In *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003),

we explained, "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship."

Instantly, Father argues that he used all resources available to him to maintain contact with E.R.A.G. while he was incarcerated. He begins by identifying the FSP goals that he claimed were unattainable while incarcerated at SCI Coal Township, *i.e.*, completing parenting classes, submitting to mental health evaluations, and finding and maintaining suitable housing. Father's brief at 5-6. Next, he asserts that he attempted to comply with the remaining goal of maintaining contact with his daughter. *Id*. at 6. Father stresses that he mailed DHS letters and cards to deliver to E.R.A.G. and that he attempted to participate in virtual visitation with his daughter during his incarceration. *Id*. Additionally, Father asserts that he contacted DHS and requested the agency's assistance in establishing in-person visitation with his daughter. *Id*.

The certified record belies Father's assertion that he made a sincere and genuine effort to perform parental duties or preserve his parental relationship with E.R.A.G. The stipulated facts and the testimony presented by Ms. Harper during the hearing demonstrate Father's patent inaction. The extent of Father's communication with E.R.A.G. during his confinement

amounts to sporadic letters that he mailed to her immediately after placement and the correspondence he mailed to DHS wherein he inquired about his daughter's wellbeing. These meager efforts do not evince the commitment to his daughter that our High Court referenced in *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012), when it explained that, "pursuant to an abandonment analysis [an incarcerated parent has] a duty to utilize available resources to continue a relationship with his or her child."

To the contrary, Father failed to complete his FSP objectives or participate in any visitation with his daughter during the course of her placement. N.T., 10/29/14, at 11. Father ignored the trial court's directive to participate in virtual visitation with E.R.A.G. *Id*. at 11. Due to Father's failure to act, the prison withdrew Father from the virtual visitation program. DHS Exhibit A, at ¶ xx. When DHS offered to revive the virtual visitation process on his behalf, Father directed the agency to suspend their efforts due to his misguided belief that his release was pending. *Id*. at ¶ zz; N.T., 10/29/14 at 21. Thus, Father never visited his daughter, either personally or virtually, during the three years that she was in placement.

In addition, Father failed to exercise reasonable firmness in declining to yield to the obstacles created by his imprisonment. He failed to participate in any prison programs addressing his substance abuse, parenting, or mental health. N.T., 10/29/14, at 11. While Father's argument focuses on his bare claim that SCI-Coal Township did not offer the

required services, he neglected to document that assertion or identify what, if any, programs he could have utilized. *See* Father's brief at 5-6. Accordingly, we reject Father's insinuation that SCI-Coal Township did not offer **any** programs that would inure to his benefit. Indeed, in light of Father's demonstrated inertia generally and his disinterest in the virtual visitation program, the record supports the inference that Father's empty reliance upon the supposed lack of prison services is disingenuous. It is clear that Father not only failed to foster or continue a close relationship with his daughter, but he also flouted the prison resources that would have helped him preserve whatever parental relationship that he had formed with E.R.A.G. prior to his incarceration. Indeed, by the evidentiary hearing, Father had ceased all contact with E.R.A.G., DHS, and his own attorney. N.T., 10/29/14, at 4. Hence, the record sustains the trial court's conclusion that DHS proved by clear and convincing evidence the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(1). Father simply failed to exercise reasonable firmness in attempting to establish a parental relationship with E.R.A.G. or in performing his parental rights.

Having concluded that the trial court did not err in finding that CYS satisfied its burden pursuant to 23 Pa.C.S. § 2511(a)(1), we next review the trial court's needs and welfare analysis under § 2511(b). While the Adoption Act does not mandate that the trial court consider the effect of permanently

severing parental bonds, our case law requires it where a bond exists to some extent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993).

The extent of the trial court's bond-effect analysis depends upon the circumstances of a particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008). We have emphasized that while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 535-536 (Pa.Super. 2008). Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

As we explained in *In re K.Z.S.*, *supra* at 763 (emphasis omitted),

> In addition to a bond examination, the court may equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*See also In re A.S.*, *supra* at 483 (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability

child might have with the foster parent, and importance of continuity of existing relationships).

Herein, the trial court concluded that terminating Father's parental rights would not destroy an existing necessary relationship and that freeing E.R.A.G. for adoption would best serve her developmental, physical and emotional needs and welfare. As the certified record supports the trial court's determination, we will not disturb it.

DHS established by clear and convincing evidence that a meaningful bond does not exist between Father and E.R.A.G. Father has not interacted with E.R.A.G. on the telephone or had any form of physical contact with his daughter since before her August 2011 placement. N.T., 10/29/14, at 11. The only communication that Father had with his daughter since she was five years old was the sporadic correspondence that he mailed her for a brief period immediately after her placement. Even prior to Father's February 2011 incarceration, Father did not live with E.R.A.G. or provide her any parental care. DHS Exhibit A at ¶ r. Moreover, Father purposely flouted the trial court's directive to participate in virtual visitation with his daughter while he was incarcerated. He allowed himself to be discharged from that program due to his inaction, and he advised DHS that he did not desire its assistance in getting his authorization reinstated.

In contrast, Ms. Harper testified that E.R.A.G. is thriving in her pre-adoptive foster home. N.T., 10/29/14, at 12. She shares a close bond with

her foster parents, and the family satisfies her basic needs. *Id*. E.R.A.G.'s immunizations are current, and she is developmentally on target. *Id*. In sum, Ms. Harper opined that E.R.A.G. would not suffer irreparable harm if Father's parental rights were terminated and she believed that terminating Father's rights was in the child's best interest. *Id*. at 13. Thus, for all of the foregoing reasons, we find that the certified record sustains the trial court's conclusion that "[t]erminating Father's parental rights would not destroy an existing necessary relationship between Father and [E.R.A.G.] . . . [and that] . . . [i]t is in the best interest of [E.R.A.G.] to be adopted." Trial Court Opinion, 2/10/15, at 8.

Father argues that severing his bond with E.R.A.G. would have a severe impact on the child. Again, we disagree. Notwithstanding Father's assertions, his perspective of the potential decision to relinquish his parental rights to E.R.A.G. reveals the true nature of the fragile parent-child relationship in this case. We do not criticize Father for considering the option of voluntarily relinquishing his parental rights. In fact, a parent's ability to recognize the often-difficult reality that he or she is incapable of providing his or her child the necessary parental care and control is commendable. We observe, however, that Father conditioned his voluntary relinquishment of parental rights upon then-eight-year-old E.R.A.G. first advising him that she preferred her foster parent over him. *See Id*. at 15. As Ms. Harper explained, "he will not sign voluntaries unless he hears from

[E.R.A.G. whether] she wants him to or not[, *i.e.,*] does she choose him or [the foster mother]." ***Id***. Father's predicate condition that E.R.A.G. reject him to his face exposes the frayed connection that he has with his daughter and defeats any assertion that a healthy, beneficial parent-child relationship exists. As the trial court accurately observed, "Father wants to place the burden on [E.R.A.G.] to choose between him and the foster parent, which is inappropriate and unreasonable to place on a [c]hild." Trial Court Opinion, at 7. We agree.

Accordingly, in light of the evidence demonstrating the absence of a healthy parent-child bond between E.R.A.G. and Father, the favorable relationship that E.R.A.G. shares with her pre-adoptive foster family, and the importance of continuing that beneficial relationship, our review of the certified record supports the trial court's determination that terminating Father's parental rights best satisfied E.R.A.G.'s developmental, physical, and emotional needs and welfare.

For all of the foregoing reasons, we affirm the trial court order terminating Father's parental rights to E.R.A.G. pursuant to § 2511(a) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/29/2015</u>