J. A18006/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ADOPTION OF:  C.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  J.S.R. AND A.J.B., | : | No. 28 MDA 2015 |
| | : | |
| Appellants | : | |

Appeal from the Order Entered December 4, 2014,
in the Court of Common Pleas of Franklin County
Orphans' Court Division at No. 52 Adopt 2014

| | | |
|---|---|---|
| IN RE ADOPTION OF:  C.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  M.S., FATHER, | : | No. 164 MDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the Order Entered December 4, 2014,
in the Court of Common Pleas of Franklin County
Orphans' Court Division at No. 52-Adopt-2014

BEFORE:  FORD ELLIOTT, P.J.E., STABILE AND MUSMANNO, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:       **FILED SEPTEMBER 10, 2015**

This matter concerns the trial court's order denying the petition for the involuntary termination of M.S.'s ("Natural Father") parental rights to C.S. ("Child") filed by A.J.B. ("Natural Mother") and J.S.R. ("Proposed Adoptive Father") (collectively "Appellants").  Appellants filed an appeal from the trial court's December 4, 2014 order at No. 28 MDA 2015.  Natural Father filed a

cross-appeal from the trial court's December 4, 2014 order at No. 164 MDA 2015. On March 4, 2015, this court consolidated the appeals.

We first address the motion to quash filed by Natural Father. Natural Father argues Appellants' appeal should be quashed due to their failure to file a statement of errors complained of on appeal with their notice of appeal as is required in children's fast track appeals. The record indicates Appellants filed a timely notice of appeal on January 2, 2015, from the December 4th order. On January 5, 2015, the trial court entered an order finding that Appellants had not filed a concise statement as required by Pa.R.A.P. 905(a)(2) and 1925(a)(2)(i). That order, however, did not direct Appellants to file a concise statement. On January 16, 2015, Natural Father filed his timely cross-appeal from the December 4th order and concurrently filed his concise statement.

On February 20, 2015, after docketing statement review, this court issued an order directing Appellants to file the requisite concise statement in the trial court, to serve the concise statement on the trial judge and other parties, and to file a copy of their concise statement with the Superior Court's Prothonotary's Office by March 2, 2015. On February 27, 2015, counsel for Appellants filed a copy of their concise statement with the Prothonotary of the Superior Court. The statement was time-stamped as having been filed in the Court of Common Pleas on February 27, 2015. The

proof of service represented that counsel served opposing counsel by mail and served the trial judge by personal service.

Although Appellants did not file their concise statement with their notice of appeal, we note that this court's decision in *In re K.T.E.L.*, 983 A.2d 745 (Pa.Super. 2009), makes clear that a failure to file a Rule 1925(b) statement concomitantly with the notice of appeal will result in a defective notice of appeal, but is not necessarily a basis for quashal. *Id.* at 747. Instead, whether this transgression results in quashal of the appeal should be determined on a case-by-case basis taking into consideration, among other factors, prejudice to the other parties in the case. *Id.* at 748.

Natural Father argues that he will be prejudiced by allowing Appellants' appeal to proceed because neither he nor the trial court knew of the basis for their appeal when the trial court filed its opinion and when he submitted his brief. Clearly, the trial court did not have the benefit of Appellants' statement. Nonetheless, this case concerns the trial court's order denying Appellants' petition to involuntarily terminate Natural Father's parental rights to Child. The trial court's opinion addresses the relevant sections, 23 Pa.C.S.A. § 2511(a)(1), (2), and (b), of the Adoption Act under which Appellants sought to terminate Natural Father's parental rights. The only issue raised by Appellants in their brief concerns Section 2511(b). The trial court addressed this issue. Consequently, we find no prejudice to Natural Father's interests. Furthermore, Appellants complied with this court's order

directing them to file their Rule 1925(b) statement by March 2, 2015. Accordingly, Natural Father's motion to quash is denied. We can now proceed to address the merits of the appeals filed by Appellants and Natural Father.

We adopt the factual history of the matter as summarized by the trial court:

> Father filed a complaint in custody on September 5, 2014. As of the time of hearing, Father had had no contact with his minor child since April 2013, a span of approximately 15 months. Father has an arrearage of approximately $2,000.00 in child support, which he asserted was due to periods of unemployment of approximately three months, and other difficulties making payments, but that he has been consistently making payments as required under a Domestic Relations order. His payments total what he is required to pay by the Domestic Relations support order. Father has never sought to contest the support amount, nor has he made efforts to refuse employment in an effort to avoid paying support.
>
> The Court finds that following the child's conception, Mother and Father initially lived for approximately three to four months in Chambersburg, Pennsylvania. Due to financial difficulties, they ultimately lived with [Mother's] parents for approximately ten months. Father was suspected of "cheating" on Mother, and so Father was thrown out of Mother's home. Father testified that he was physically threatened at the time that he left by maternal grandfather. He left without his personal belongings and walked approximately 13 miles to Shippensburg, Pennsylvania. Maternal grandfather denied claims that he referenced a hand gun or ever produced one when ordering [Father] to leave the maternal grandparents' home.

Subsequent to [Father] and Mother's separation, Father briefly lived in Carlisle, Pennsylvania. He would exercise at least two periods of custody per week, although the parties never entered into a formal custody arrangement. Father continued to see the child and provide the child gifts. Subsequent to the parties' separation, Father testified that due to his financial circumstances, he moved to Harrisburg, Pennsylvania and had roommates. Mother objected to his living arrangements. Father briefly lived with his mother for three or four months. Since his mother is a smoker and the child's mother did not approve of her smoking, Father did not exercise overnight custody with the child while residing with his mother. When Mother would protest about Father's living arrangements, the parties would work out alternate arrangements to meet in supervised locations or settings, including public venues.

At one point Mother and Father attempted to reconcile, but ultimately they were unable to reconcile, and Father found a new relationship with [C.B.]. Both counsel for Father and counsel for the child assert and argue that this information is relevant to the Court's determination when considering Father's conduct in the six months prior to the filing of the petition. Father asserts Mother's dissatisfaction with Father's new relationship resulted in a pattern of conduct by Mother and her family in which they placed obstructions in the path of Father's efforts to exercise custody with the child. Mother testified that Father had not supplied any gifts, cards, or other information to the child in the preceding six months, and that the last time that Father presented any type of significant gifts to the child would have been outside the six month period. Father acknowledged that for Christmas 2013, he may have bought gifts, but that he did not supply them to the child as prior gifts to the child in 2012 had been returned, specifically a scooter that Father's girlfriend [C.B.] supplied to the child. Mother testified that she did not attempt to block Father from contacting her, that she continued to

remain and live in the same location, that she did not change her phone number, and that even if she had changed her phone number, Father was certainly aware of her family's residence and could have reached out to her or attempted to see the minor child by contacting them. Father testified that he was in fear of returning to Mother's home, as he had been forced to leave due to threats by maternal grandfather. He testified that Mother had blocked Father's phone access, Facebook, social medial [sic], and any other ability to contact her. Father acknowledged he was aware of where Mother's family lived.

Mother and her fiancé, [J.R.], as well as Mother's sister, all testified that they were able to access the Facebook account of [Father], as well as that of [Father]'s girlfriend, [C.B.]. They obtained photographs and information of Father's conduct from approximately August 6, 2012 up through the end of September, 2014. The Court notes that the Facebook postings of [Father] are essentially completely devoid of any reference to his son, and principally focus on his relationship with [C.B.]. The Court notes that the postings reveal multiple trips and excursions, including trips to New York Giant football games at Met Life Stadium and FedEx Field, a New York Yankees baseball game at Yankee Stadium, trips to Atlantic City, and to the Outer Banks. Father testified the trip to the Outer Banks was paid for by his mother as a gift to [C.B.] for her success in graduating from law school. The Facebook postings also reveal gifts to [C.B.] such as a Tiffany necklace and a Coach bag. Father testified that he essentially did not pay for any of these excursions, trips, or other items. He was in essence supported by [C.B.] in their social activities. He denied the assertion by Mother and proposed adoptive father that he had resources to pay for legal services to attempt to secure custody of his son since he was denied custodial access in April 2013. Father testified that he used Facebook as a social forum to post matters relating to his relationship with [C.B.], but chose to not post items about his

son, which he characterized as a different type of relationship that was inappropriate for social media postings. Father testified generally that he did not have the financial wherewithal to secure an attorney, and could not even afford to consult with an attorney. He also testified that it "took him awhile to figure out the paperwork" to ultimately file a custody complaint as a self-represented litigant approximately 13 months after the last time he had exercised custody with his son. Father testified that he generally has always been employed, that he traveled to Pittsburgh, Pennsylvania for the purpose of interviewing for a managerial position with Applebee's, which is the explanation for another trip that he took with [C.B.].

Proposed adoptive father, [J.R.], testified that he is currently employed at Letterkenny and he has stable employment. He also testified that he and the minor child have developed a bond and that on occasion the child has called him Daddy. Both he and natural Mother deny that they have encouraged the child to refer to him as Daddy, and that he is often referred to as [J.] by the minor child. He testified that he and the child interact, play games, travel, and do things together. He has been very involved in the child's life, and it is his intent to marry natural Mother. He testified that the decision to seek involuntary termination of parental rights was only thought about and made known to him and Mother once they consulted with an attorney after Father had filed the complaint for custody. He also testified that the bond between [him] and the child [has] become so strong that "the child cried significantly and was fearful that he would not return from a business trip that he was taking."

Although counsel for the minor child asserted that natural Father would never win a father of the year award, [] it was his opinion that the minor child's welfare was dependent upon a relationship with natural Father, and that natural Father's failings in pursuing custody had more to do with Mother's efforts to deny him access to the child and Father's

> past experiences with Mother's family than it did with Father's neglecting or not wanting to perform parental duties.

Trial court opinion, 12/4/14 at 2-6.

Appellants' petition for involuntary termination of Natural Father's parental rights was filed two weeks after Father filed his complaint for custody on September 5, 2014. Two days of hearings took place on November 7 and 24, 2014. On December 4, 2014, the trial court entered an order accompanied by an opinion. The trial court found that "Father did not act affirmatively, and that it is likely that his actions could constitute a failure to perform parental duties under subsection (a)(1), or that he was neglectful of the child under subsection (a)(2)." (Trial court opinion, 12/4/14/ at 13.) The trial court then proceeded to analyze Section 2511(b) and determined it would serve Child's needs and welfare to permit Father to re-establish a custodial relationship. (*Id.* at 13-16.) Hence, the trial court denied Appellants' petition. Appellants appealed the order; Natural Father filed a cross-appeal.

Appellants raise one issue for our consideration:

> A. The trial court abused its discretion in not finding that Petitioners met their burden of proving that the welfare of the child would be adversely affected by said Court's denial of their Petition for involuntary termination of the parental rights of Respondent under 23 Pa.C.S.A. 2511(b).

Appellants' brief at 4.

We review the determination of the orphans' court for an abuse of discretion. **In re D.C.D.**, 105 A.3d 662, 670 (Pa. 2014) ("When reviewing a trial court's decision to grant or deny a termination of parental rights petition, an appellate court should apply an abuse of discretion standard, accepting the findings of fact and credibility determinations if they are supported by the record, and reversing only if the trial court made an error of law or abused its discretion."). This is a highly deferential standard, and to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination. **In re A.S.**, 11 A.3d 473, 477 (Pa.Super. 2010). Appellants have the burden of proving the statutory grounds for termination by clear and convincing evidence. **In re Adoption of L.J.B.**, 18 A.3d 1098, 1107 (Pa. 2011).

Requests to terminate the parental rights of a biological parent are governed by 23 Pa.C.S.A. § 2511(a) and (b). Instantly, Appellants' argument only implicates the orphans' court analysis pursuant to Section 2511(b). That section provides as follows:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition

> filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

In reviewing the evidence in support of termination under Section 2511(b), we consider whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *See In re C.M.S.*, 884 A.2d 1284, 1286-1287 (Pa.Super. 2005), *appeal denied*, *sub nom. C.M.S. v. D.E.H., Jr.*, 897 A.2d 1183 (Pa. 2006).

"Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* at 1287 (citation omitted).

Instantly, Appellants argue Natural Father did not perform any parental duties with respect to Child from June 2013 to September 2014. (Appellants' brief at 17-18.) Appellants also assert that Natural Father did little to exert himself to maintain a parent/child relationship with Child. (*Id.* at 18.) It is Appellants' contention that the overall welfare of Child would be advanced by the termination of Natural Father's parental rights. (*Id.* at 19.)

Our review of Appellants' argument reveals much of it revolves around Father's failure to perform his parental duties. The trial court indeed found that Father had failed to perform parental duties under Section 2511(a)(1) and was neglectful under Section 2511(a)(2). Be that as it may, the trial court determined, under Section 2511(b), Appellants had failed to carry their burden. We reiterate that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b). ***In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa.Super. 2008) (***en banc***).

Appellants' sole claim in advancing an argument under Section 2511(b) is that they fear Child will suffer significant harm if Natural Father is permitted to retain his rights to Child and then disappear from Child's life. (Appellants' brief at 19.) Appellants' argument is sorely lacking as it fails to discuss pertinent case law or any statutory authority. As we noted in ***In re Estate of Whitley***, 50 A.3d 203, 209-210 (Pa.Super. 2012) (citations omitted):

> The argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with discussion and citation of pertinent authorities. This Court will not consider the merits of an argument which fails to cite relevant case or statutory authority. Failure to cite relevant legal authority constitutes waiver of the claim on appeal.

***See also In re S.T.S., Jr.***, 76 A.3d 24, 42 (Pa.Super. 2013) (citation omitted) (noting that "mere issue spotting without analysis or legal citation

to support an assertion precludes our appellate review of a matter"); Pa.R.A.P. 2119(a) (argument portion of brief must contain discussion and citation to pertinent authorities). Clearly, we could find Appellants' argument waived. However, we will instead rely on the following analysis by the trial court in finding no merit to Appellants' contention that Child will suffer any harm by having Natural Father involved in his life.

> In the context of determining the welfare of the child, the Court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. This Court finds that based upon the evidence presented that Father did have a bond with his son that is evident by the testimony and the efforts that he made to maintain a bond with his son up to and including April 2013. . . . The Court received an impassioned argument from the child's counsel, Matthew Sembach, Esquire, who testified that he had met with the child and had met with each of the parents, that there was a bond between Father and son, and that the Father and son bond should not be terminated simply because of the availability of another person standing ready, willing, and able to serve as a father to the minor child. The Court notes that Mother's fiancé indicated that while the child may have called him father on occasion, and that they had developed a bond, he did call Mother's fiancé [J.S.R.] on multiple occasions, thus indicating that he had not fully developed an understanding or concept that [J.S.R.] was his father.
>
> . . . .
>
> . . . There was no testimony in the record to indicate that somehow the child had reservations or would be in any way harmed by efforts to restore the custodial relationship between Father and son. There was no testimony offered either professionally or by other

- 12 -

> observers with experience in these types of matters to convince this Court that the child resuming a parental bond with Father would somehow destroy the happy bond that he is developing with his Mother's fiancé. Furthermore, this Court accepts that if Mother's fiancé truly loves the minor child as he stated, that he will continue to involve himself in a way to provide a positive parental influence in the child's life, while being respectful of the child's needs to have a beneficial relationship with Father to ensure that the welfare of the child is one in which he has the strongest relationships possible with both Mother and Father.

Trial court opinion, 12/4/14 at 13-15.

As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding Child's needs and welfare, we conclude that the trial court did not abuse its discretion as to Section 2511(b).

Natural Father filed a cross-appeal raising seven issues for our review. Because we are affirming the trial court's order denying Appellants' petition to involuntarily terminate Natural Father's parental rights, it is unnecessary to address those issues. The relief sought is denied as moot.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/10/2015

- 13 -