J-A12027-22
J-A12028-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.T. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1245 WDA 2021 |

Appeal from the Order Entered October 13, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000197-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: K.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1279 WDA 2021 |

Appeal from the Order Entered October 13, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at No(s):
CP-02-AP-0000197-2019

BEFORE:   MURRAY, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED: JUNE 2, 2022**

In these consolidated matters, the Allegheny County Office of Children,

Youth, and Families (CYF) and K.T. (Child), through her *guardian ad litem*,

appeal the denial of the petition to involuntarily terminate the parental rights

---

[*] Retired Senior Judge assigned to the Superior Court.

of K.S.T. (Mother) as to her six-year-old daughter, Child.[1]  CYF filed its petition on November 30, 2020, pursuant to Sections 2511(a)(2), (5), and (8) and (b) under the Adoption Act.  23 Pa.C.S. § 2511(a)(2), (5), (8), (b).  The orphans' court determined that CYF established the grounds for termination under Section 2511(a), but that CYF failed to provide clear and convincing evidence[2] that termination best served Child's needs and welfare under Section 2511(b).  Thus, the court concluded that CYF failed to meet the second prong of the bifurcated termination analysis; the court found that the evidence presented proved that Child had an emotional bond with Mother, and permanently severing that bond would have a detrimental impact on Child.  The court denied CYF's petition, and CYF and Child timely appealed.  After careful review, we affirm.

In its opinion, the trial court summarized the evidence presented regarding Mother's history and involvement with CYS, deeming it to have clearly and convincingly established the statutory grounds for involuntary termination pursuant to Section 2511(a)(2), (5), and (8):

> Mother first came to the attention of CYS dating back to 2009, but the present case regarding [C]hild began upon [C]hild's birth in

---

[1] Child was born in June 2016.  The parental rights of Child's biological father, E.M. were terminated by Order of the court dated October 13, 2021.  E.M. has not filed an appeal of the order terminating his parental rights.

[2] Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." ***In re Adoption of K.C.***, 199 A.3d 470, 473 (Pa. Super. 2018) (citation omitted).

- 2 -

> 2016 when [C]hild was born drug exposed, resulting in concerns about Mother's substance use.
>
> - - -
>
> Due to continued substance abuse and housing instability, as well as a report of an incident involving Mother's older child, CYF removed [C]hild from the home on March 7, 2017. By this time, CYF had become concerned with Mother's mental health… In June of 2017, [C]hild [, who was originally placed with her maternal grandmother] was re-placed with her godmother, [N.P.], an adoptive resource, where she has remained since that time.
>
> - - -
>
> Mother has had continuing issues with substance abuse, having attempted several times to abstain, with the help of CYF, which started at a young age.
>
> - - -
>
> She started out hanging out at bars and started using marijuana at the age of 14 or 15. This became a daily habit and she eventually started using cocaine, which was sometimes offered to her by patrons at the adult entertainment club where she worked. Her early life has resulted in the diagnosis of several mood and personality disorders. As a result, she has experienced issues focusing, as well as regulating her responses to stress. This had led to a history of summary citations and criminal charge(s).
>
> Mother has made progress in dealing with her mental health concerns, as well as substance use concerns, but has had trouble improving her judgment and achieving and maintaining a stable pattern of adjustment. Mother continues to be unable to understand the role of drugs in her life and how they affect behavior otherwise and, in combination with the other concerns regarding her mental health, this results in a guarded prognosis for improvement.

Trial Court Opinion (TCO) at 2-3, 14 (citations omitted).

CYF presents one issue for our review:

> Whether the trial court erred as a matter of law and/or abused its discretion in denying CYF's petition to involuntarily terminate the parental rights of Mother, K.T. after CYF proved by clear and convincing evidence that termination of Mother's parental rights

would best serve the developmental, physical and emotional needs and welfare of the child pursuant to 23 Pa.C.S.A. §2511(b)?

CYF's Brief at 3. Child presents a substantially identical issue in this appeal.

Child's Brief at 6.

We begin our review by setting forth our standard of review:

When a trial court makes a "close call" in a fact-intensive case involving a goal change or the termination of parental rights, the appellate court should review for an abuse of discretion and for whether evidence supports the trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court.

*In the Interest of S.K.L.R*., 256 A.3d 1108, 1124 (Pa. 2021). And further,

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon a determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.[3] As stated

---

[3] In *In re C.M.K.* 203 A.3d 258 (Pa. Super. 2019), our Court explained the bifurcated analysis as follows:

above, the court found that statutory grounds for termination existed under Sections 2511(a)(2), (5), and (8); these findings are uncontested, and CYF therefore met the first prong of the bifurcated analysis. We therefore review whether the second prong of the analysis was met. Section 2511(b) states in relevant part:

> (b) Other considerations. – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to beyond the control of the parent.

23 Pa. C.S. §2511(b).

> Our Court has explained the application of Section 2511(b) as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S*., 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is

---

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory ground for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*Id*. at 261-262 (citation omitted).

- 5 -

reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 763.

*In re Adoption of J.M*., 991 A.2d 321, 324 (Pa. Super. 2010). In regard to the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K*., 203 A.2d at 264 (citation omitted).

Further, we note that "[w]hile a parent's emotional bond with her child is a major aspect of the [Section 2511(b)] best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M*., 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted). "The trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id.* (quoting *In re A.S*., 11 A.3d 473, 483 (Pa. Super. 2010)).

In its opinion filed pursuant to Pa.R.A.P. 1925(a), the orphans' court stated:

> In the instant case, this court considered the evidence and testimony presented and found that CYF failed to demonstrate, clearly and convincingly, that termination would meet the needs and welfare of [Child]. The evidence presented and submitted to this Court instead proved that [Child] had an emotional bond with her Mother, and that permanently severing that bond would have a determinantal impact on [Child].

Trial Court Opinion (TCO), 11/22/21, at 15. The court noted that of seven witnesses called by CYF at the two-day trial, only two testified as to the bond between Mother and Child: Amanda McCloy, caseworker for CYF[4] and Dr. Neil Rosenblum, a clinical psychologist who performed three individual and interactional evaluations of Mother and Child, and of foster mother and Child, over a two and one-half year period. *Id*. at 16-17; *See* CYF Exhibit 3 – Forensic Evaluation Reports by Neil D. Rosenblum, Ph.D., 5/19/18, 1/14/20, 12/18/20.

In its opinion, the court highlighted Dr. Rosenblum's forensic evaluation reports regarding Child's eagerness to spend time with Mother as well as his testimony regarding Child's attachment to Mother, the fact that she very much enjoys seeing and spending time with Mother, and the reluctance Child displayed at having to leave Mother at the end of a visit. TCO at 17. The court further accentuated Dr. Rosenblum's testimony that there has been no significant period of time where Mother and Child have not been in some sort of contact, and that Mother sees Child more than many of the parents he has evaluated in similar situations. *Id*. at 18. Finally, the court referred to Dr.

_____

[4] Ms. McCloy provided testimony regarding Mother's treatment for substance abuse and her criminal history; however, she provided scant testimony regarding the bond between Mother and Child, noting only that when being transported to her visits, Child looks forward to seeing Mother and that Mother was generally nurturing of Child; she testified that due to Covid and the need for virtual contact only, she had never had to opportunity to observe in-person interaction between them. N.T. 5/12/21 at 92, 128.

Rosenblum's specific statement that Child should be allowed to maintain some

degree of contact with Mother.[5] *Id*. The orphans' court concluded that "the

_____

[5] At the hearing, the orphans' court questioned Dr. Rosenblum at length, inquiring specifically whether he thought that Mother would ever be in a position to assume a safe and secure environment for [Child] to grow and develop. Dr. Rosenblum answered as follows:

> Not for this child, no. Again, I believe the die has been cast. Attachment is most critically formed in the--between one and two years of life. This child has lived now almost five years in the same home. I think she has a secure foundation, a secure relationship with her primary caregiver. I would say the verdict would be out as to whether birth mother might ever be in a position to parent a child successfully. But for this child I believe there would be significant trauma for [Child] to be removed from this home. So I don't see a very favorable prognosis even if [Mother] was functioning significantly better than she is now, which, again, there's no guarantee. But I think for this child the train has left the station quite some time ago.

N.T., 5/13/21 at 127. The court then referred to Dr. Rosenblum's final report, quoting back to him the doctor's final statement, wherein he indicated that Child should be allowed to maintain some degree of contact with her mother and that he saw no harm in occasional visits, even if supervised; the court asked Dr. Rosenblum whether he believed that Child should be allowed to maintain some contact with Mother and Dr. Rosenblum responded,

> Yeah. I always – almost always feel that way. I don't believe that birth mother [is] malicious towards her daughter. I think her love is genuine. Again, I think life has not given birth mother the best support or help in forming a positive identity for herself and a positive direction in her life. As I said, there's a lot of conflict right now and existing animosity between the foster mother and the birth mother. But if we were to look at ideally what would be in [Child]'s best interest, certainly the love that her mother has for her if it can be shaped into a supportive role, not a critical role, not putting foster mother down, not criticizing her care, there's always an advantage to having those connections to, you know, biological roots and people who love you.

evidence clearly established that if the emotional bond between [Child] and [Mother] was permanently severed, then [Child] would be adversely affected," and that it was "within its discretion when it denied CYF's petition to terminate Mother's parental rights." *Id*. at 18-19.

Dr. Rosenblum testified at great length regarding both the Mother-Child relationship and Child's relationship with her foster mother. He opined unequivocally that Child's strong, primary attachment is to her foster mother; foster mother's home is the only home Child can remember, she thrives under her foster mother's care, and she would experience significant trauma if she were removed from the foster home. N.T., 5/13/21 at 120-21, 127. At the hearing, he summarized his observations of the Mother/Child relationship as follows:

> Well, [Child] certainly knows her mother. She is always glad to see her. I would say they have a playful relationship. Mother does tend to try to be active with her and engage in positive activities. I would say that [Mother] is not as - doesn't treat [Child] in as mature a fashion as her foster mother does. She tends to fuss over her, refer to her as her baby. She is her youngest child. She doesn't provide her with the same degree of structure or exposure to learning or cognitive activities as foster mother does and she is not as directive in getting her to engage in learning activities or developmental activities that would expand her knowledge. But she's nurturing. She's affectionate with [Child].

N.T., 5/13/21 at 85.

---

*Id*. at 128.

Dr. Rosenblum referred to foster mother as Child's "instrumental parent," and to the relationship between Mother and Child as "a more ancillary relationship." *Id*. at 90. However, when questioned as to whether, if Child were to have less or even no contact with Mother, the lack of contact would be so detrimental to Child that the court should not terminate parental rights, Dr. Rosenblum responded,

> No. I think it would be a loss, but in my clinical opinion it does not outweigh the need for the opportunity to move forward in her life with the continuity of care and with the sound direction that [Child] – and emotional support that she receives in her current family environment.

*Id*. at 130.

On appeal, CYS claims the orphans' court's conclusions are manifestly unreasonable and unsupported by the record. CYS acknowledges that the record supports the court's conclusion that there is an emotional bond between Mother and Child but asserts that it erred when it neglected to examine Child's bond with her foster parent or consider Child's need for permanency as part of its needs and welfare analysis. Child contends that the court took Dr. Rosenblum's reports and testimony out of context to support its conclusion that termination of Mother's parental rights would not serve Child's needs and welfare. We cannot agree.

Over the course of two days of hearings, the orphans' court questioned Dr. Rosenblum at length as to whether he believed Mother might ever mature to the point where she might provide a safe and secure family environment in

which Child could grow. The orphans' court heard testimony from Dr. Rosenblum as to Child's relationship with her foster mother and listened as well to his opinion as to the trauma he believes Child would experience if she were removed from her foster mother's home. The record contains, *inter alia*, Dr. Rosenblum's final forensic evaluation, wherein he concludes that the foster mother, who works as a teaching assistant at the same school Child attends, is "very nurturing and emotionally supportive" and has done "an excellent job of providing [Child] with a safe, stable and secure family environment." Forensic Evaluation Report, 12/18/20, at 11.

Our Supreme Court has instructed us that:

> Termination of parental rights is among the most powerful legal remedies that the judicial system possesses. The decision to sever permanently a parent's relationship with a child is often bound up in complex factual scenarios involving difficult family dynamics and multiple service providers. Our trial courts are tasked with carefully considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party has met its burden of proving by clear and convincing evidence that termination meets the exacting standards outline in the Adoption Act.

*In the Interest of S.K.L.R*., 256 A.3d at 1129.

Here, we allow that the record supports a finding that Child's needs and welfare may best be served by a life in foster mother's home: "[i]f she remains in her current placement, [Child] faces a very bright future, with a high probability of continued success and sustained emotional growth in the years to come." Forensic Evaluation Report, 12/18/20, at 11. There is abundant

evidence that Child's bond with her foster mother is a strong one, and the significant trauma that would be caused if Child was removed from the foster home. While our Court has held that the orphans' court can equally emphasize the relationship between a child and a foster parent, we have not required the court to do so. *See N.A.M*., 33 A.3d at 103. Here, the orphans' court's denial of the termination petition was ultimately informed by its evaluation of the bond that clearly exists between Mother and Child, and its determination that this bond was worth preserving. On appeal, we must review whether the record supports that determination, and we find that it does.

Before the orphans' court, Dr. Rosenblum's evaluation, however conditional ("if it can be shaped into a supportive role, not a critical role, not putting foster mother down, not criticizing her care"), was that it would be in Child's best interest to be allowed to maintain some degree of contact with Mother. N.T., 5/13/21, at 127-128. We cannot reweigh the evidence, and as such we conclude that there is record support for the orphans' court decision to deny CYF's termination petition under Section 2511(b). The orphans' court acted within its discretion, and we therefore affirm the court's October 13, 2021 order.

Order affirmed.

Judge McCaffery joins the Memorandum.

Judge Murray files a Dissenting Memorandum.

J-A12027-22

J-A12028-22

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  6/2/2022