J-S04031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.A.J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2389 EDA 2022 |

Appeal from the Decree Entered August 26, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000359-2022

BEFORE:  MURRAY, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED MARCH 16, 2023**

J.P. (Mother) appeals from the decree entered in the Court of Common Pleas of Philadelphia County (trial court) granting the petition filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate her parental rights to K.A.J.P. (Child) (age two; d.o.b. July 2020) pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8) and (b), and changing the permanency goal to adoption.[1]  She argues that the trial court erred in

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court also involuntarily terminated the parental rights of all unknown putative fathers on August 26, 2022.  On August 30, 2022, the trial court granted DHS's petition to verify the deceased status of Child's known putative father who had been identified on her birth certificate and fatally shot soon after her birth in 2020 before the completion of ordered paternity testing.

finding that DHS provided clear and convincing evidence to support termination. We affirm.

We take the following factual background and procedural history from the trial court's November 10, 2022 opinion and our independent review of the record.

## I.

## A.

On July 4, 2020, Child and Mother tested positive for oxycodone and fentanyl at the time of Child's birth at the Hospital of the University of Pennsylvania (HUP). (N.T. Hearing, 6/27/22, at 16). Mother stated that she took both prescribed and illegally obtained oxycodone and several medications for leg pain and for her diagnoses of anxiety, depression and post-traumatic stress disorder (PTSD). She could not explain the presence of fentanyl.

DHS attempted to establish a safety plan with Mother near the time of Child's discharge, but deemed the resources identified by Mother as inappropriate. DHS obtained an order of emergency protective custody and placed the then two-week-old infant in general foster care with the foster parent who was still caring for her at the time of the termination hearing and is Child's pre-adoptive resource (resource parent).[2] On July 20, 2020, Mother

_____

[2] Child was briefly placed with maternal kin for four months for an unsuccessful attempt to place her in kinship care. (*See* N.T. 6/27/22, at 41-43, 65); (N.T. 8/26/22, at 34-35); (DHS Exhibit 1, at Orders, 1/15/21, 6/03/21, 10/06/21).

appeared with appointed counsel at a shelter care hearing at which the court found that emergency foster care placement was necessary and authorized temporary removal of Child from Mother's custody. (**See** DHS Exhibit 1, at Order, 7/20/20).[3]

The court adjudicated Child dependent at a September 21, 2020 hearing and fully committed her to the custody of DHS, finding by clear and convincing evidence that Child was "without proper care or control … necessary for [her] physical, mental, or emotional health, or morals" pursuant to the Juvenile Act,[4] 42 Pa.C.S. § 6302. (DHS Exhibit 1, at Order, 9/21/20). The court ordered a home assessment and visitation for the putative father's parents. Although Mother's counsel appeared at the adjudicatory hearing, she did not do so or challenge the court's September 21, 2020 order.

The court held an initial permanency review hearing on January 15, 2021. Mother appeared and the court ordered her to achieve several goals in order to have Child returned to her. Specifically, the court ordered that she provide proof of her housing and employment to the Community Umbrella Agency (CUA) case manager and report to the family court's clinical evaluation unit (CEU) for a forthwith drug screen, coordination of random screens prior

---

[3] The court also appointed the Defender Association of Philadelphia as legal counsel and guardian *ad litem* for Child.

[4] 42 Pa.C.S. §§ 6301-6375.

to the next hearing, and monitoring of her self-referred treatment program. The court authorized the CUA to obtain a progress report and treatment plan from Mother's drug and alcohol treatment provider and to supervise Mother's visitation with Child unless all parties agreed to modify the visitation terms. Mother's objectives were to address her drug use and mental health through treatment, to stabilize her housing and parenting ability through the Achieving Reunification Center (ARC), to visit Child as ordered by the court, to sign consents and provide documentation for monitoring of her treatment programs, and to obtain treatment for Child if needed. (*See* N.T. 6/27/22, at 22-23).

The permanency plan stayed the same over the course of the case. At each review, the court found that the CUA and DHS were making reasonable efforts at reunification, but that Mother's participation and progress were minimal. (*See* DHS Exhibit 1, at Orders, 6/03/21, 10/06/21, 11/22/21, 2/07/22, 6/27/22); (N.T. 6/27/22, at 33, 37, 41); (Trial Court Opinion, 11/10/22, at 13).

Mother did not appear for the June 3, 2021 permanency review hearing, at which time Child was approaching her first birthday. That summer, Mother missed over half of her scheduled visits with Child and the court ordered weekly supervised visits on-site at the CUA, withdrawing its permission for them to occur in a community setting. Because the CUA caseworker was unable to obtain evidence of Mother's drug and alcohol treatment progress,

the court ordered that Mother was to be fully assessed for treatment recommendations at the CEU rather than for the CEU to monitor her treatment. (*See* DHS Exhibit 1, at Orders, 6/03/21, 10/06/21, 11/22/21, 2/07/22, 6/27/22).

Despite an October 6, 2021 hearing being continued by joint request, Mother appeared in court. The court ordered her to have a drug screen forthwith on-site at the CEU, with an intake assessment and random drug screens to be completed before the next hearing. (*See* DHS Exhibit 1, at Order, 10/06/21). Mother failed to appear at the CEU, at the next review hearing or at any other review hearings until after the petition for involuntary termination was filed.

On November 22, 2021, after the court discovered that Mother attended only two out of seven of her most recently scheduled visits with Child, it reduced the visits from weekly to twice per month. (*See* N.T., 6/27/22, at 37); (DHS Exhibit 1, at Order, 11/22/21). Appellant did not attend any visits with Child in December 2021 or January 2022.

In February 2022, the court found Mother's participation minimal and scheduled a goal change hearing for a court listing. Mother's twice monthly visits remained supervised at the CUA, with confirmation required twenty-four hours in advance. The court awarded weekly visitation to putative paternal relatives that Child had not met. (DHS Exhibit 1, at Order, 2/07/22).

After her two-month absence, Mother resumed visitation with Child, attending five of the six scheduled visits in February and March. In May and June, she attended two of the four scheduled visits, arriving late for both. (DHS Exhibit 2, at Visitation Summary, 5/03/22 and 6/15/22).

**B.**

On June 3, 2022, DHS filed a petition to involuntary terminate Mother's parental rights (TPR petition) and to change Child's permanency goal to adoption. The court held two hearings on the TPR petition on June 27, 2022, and August 26, 2022.[5] CUA case manager Kellie Lawson and visitation coach Dorian Williams testified on behalf of DHS. Their testimony was "deemed to be credible and accorded great weight" by the trial court. (Trial Ct. Op., at 12).

**1.**

Ms. Lawson confirmed that Mother's single case plan objectives included drug and alcohol and mental health counseling, parenting classes and to sign all consents and releases for herself and Child. The only treatment information she was able to obtain was that Mother had been discharged from a suboxone maintenance program at Temple because it was not medically appropriate for her rehabilitative needs. Although Mother signed up at Merakey for drug and

---

[5] Mother appeared at the June 27, 2022 hearing but did not testify on her own behalf. Mother failed to appear for the August 26, 2022 hearing, but her counsel was in attendance.

alcohol treatment, she was discharged for non-attendance and told Ms. Lawson that she had not been attending because she had housing problems, issues with her legs, work and too many demands on her schedule. Ms. Lawson called Mother about random drug screens on April 25, May 16, May 23 and June 1, 2022, but Mother failed to provide them, stating it was due to her schedule of living with her daughter in Delaware because her housing situation was not stable.[6] She did restart drug treatment at Merakey on June 21, 2022, but it was approximately a week before the TPR hearing (and weeks after the TPR petition was filed). She produced positive drug screens on June 27, 2022 (amphetamines and benzodiazepine) and August 10, 2022 (benzodiazepine) without an explanation or a prescription. (*See* N.T., 6/27/22, at 22-23, 26-28, 26-32, 34, 37, 60-61); (N.T., 8/26/22, at 36).

Mother obtained part-time employment as a home health aide and completed housing training with ARC, but she did not have housing for Ms. Lawson to assess. She finally attended parenting classes after the TPR petition was filed, although they always had been part of the case plan. (*See* N.T., 6/27/22, at 31-32, 45, 61-62).

Ms. Lawson testified that it would be in Child's best interest to terminate Mother's parental rights to free Child for adoption by resource parent and that

---

[6] Despite Mother's representation that she was unavailable for drug testing, she had an in-person visit with Child on June 1, 2022, at the CUA in Philadelphia. (*See* Visitation Summary, 6/15/22, Entry 6/01/22).

Child would not suffer any irrevocable harm if Mother's parental rights were terminated. Child is happy, healthy and bonded with resource parent who provides her with care and comfort, takes her to doctor's appointments, supports her speech therapy and provides for all her needs. (**See id.** at 52-55, 58-59).

**2.**

Ms. Williams testified that she supervises almost all of Mother's visits with Child, and that the quality and effort Mother put forth had regressed since when the case began. In the beginning of the case, Mother would arrive to visits on time, would bring things for Child and was interested in knowing about Child and keeping her attention. After those first few months, Mother was almost always late to any visits she actually attended, stopped bringing Child things like clothes and shoes, and did not interact with or ask questions about Child. Instead, she mostly talked about her life with Ms. Williams, despite Ms. Williams's encouragement to pay attention to Child. (**See** N.T., 8/26/22, at 8-21).

Ms. Williams explained there was no recommendation to offer increased or unsupervised visitation with Child because Mother's progress remained minimal throughout the life of the case, despite her attending five of six visits between February and April 2022. For example, in May 2021, Ms. Williams noted that Mother had attended ten out of the last sixteen visits and was late seven out of the ten times she appeared. (N.T. at 13). Mother's compliance

continued to be minimal, only attending two of seven visits over the summer of 2021, failing to attend in December 2021 and January 2022, continually arriving late for the visits she would make, and missing approximately half of her visits overall. (*See id.* at 16-21); (*see also* N.T., 6/27/22, at 37, 40). Mother appeared "sluggish" at the visits during the first year of the case and, although she started to do Child's hair during the visits, she was unable to finish, which "was significant because [Child] had very little hair, and it took her a long time to do the very little that she has." (N.T., 8/26/22, at 20); (*see id.* at 17). After the TPR petition was filed, Mother continued to miss one-third to one-half of her visits, which the court had permitted to occur weekly pending the conclusion of the TPR hearings. (*See* N.T., 6/27/2022, at 72); (DHS Exhibit 2, at Visit Summary at 6/15/22 and 8/15/22).

Ms. Williams testified that there appeared to be no bond between Child and Mother. (*See* N.T., 8/26/22, at 10). Child is "comfortable," but quiet and "just there" with Mother, who is "polite" with her daughter. However, Child engages and plays with her paternal aunt who has visited her since April 2022 and will hold Ms. Williams's hand instead of Mother's. (*Id.* at 10-12, 19). She is "a completely different person with the resource parent." (*Id.* at 11). She makes sounds, smiles, stomps her feet in excitement, "makes … a high pitch squeaking noise" and "lights up" for the resource parent. (*Id.* at 22); (*see id.* at 11, 21-22) (Child waits at the door for the resource parent when the visit is over, pulling Ms. Williams to the door to see if she can leave). Although

Child had not begun talking in June 2022 at the time of the first TPR hearing,[7] by August she began early intervention and was repeating whatever the resource parent said. (*See id.* at 11). Child treats the resource parent's home as her own, she "hovers" around the resource parent and follows her from room to room, and the resource parent is highly attentive to her. (*See* N.T., 6/27/22, at 54, 57-59). Ms. Williams testified that Child's primary bond is with her resource parent. (*See* N.T., 8/26/22, at 24).

At the conclusion of the August 26, 2022 hearing, the court found clear and convincing evidence to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8) and 23 Pa.C.S. § 2511(b).

Mother timely appealed and filed a contemporaneous Rule 1925(b) statement. *See* Pa.R.A.P. 1925(a)(2)(i). She argues that under the totality of the circumstances, the record does not reflect that she has manifested a

---

[7] Mother quotes to the language, "is Mom coming?" from the hearing to support her assertion that Child was asking about her. (Mother's Brief, at 8). However, a review of the transcript reveals that this quoted language was part of DHS counsel's question to Ms. Lawson about whether Mother attended visits. In fact, because Child was not yet speaking at the time of the June hearing, Mother's claim that Child said this is impossible. (N.T., 6/27/22, at 48); (*see id.* at 52).

settled purpose to relinquish her parental claim or a failure or refusal to perform parental duties. (***See*** Mother's Brief, at 10-11).[8]

## II.

## A.

It is well-settled that the party seeking termination must provide clear and convincing evidence to do so. ***See In re Adoption of C.M.***, 255 A.3d 343, 358 (Pa. 2021). "Clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (citation and brackets omitted). The trial court terminated Mother's parental rights pursuant to Section 2511(a)(1),(2), (5), (8) and (b) of the Adoption Act, which provides:

> **(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

---

[8] We review the orphans' court's order for an abuse of discretion. ***See In re G.M.S.***, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." ***In re Interest of D.F.***, 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." ***In re S.H.***, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re A.S.***, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***Id.***

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

It is well-settled that "[w]e need only agree with [the trial court's] decision as to any one subsection of Section 2511(a) and subsection (b) in order to affirm the termination of parental rights." *Int. of K.M.W.*, 238 A.3d 465, 473 (Pa. Super. 2000) (citation omitted).  For the following reasons, we conclude that the trial court correctly determined that DHS met its burden of proof under subsections 2511(a)(1) and (b).

**B.**

Mother argues that there is little in the record to suggest that she manifested a settled purpose to relinquish her parental rights because in the period immediately preceding the filing of the TPR petition, she attended five out of six of her scheduled visits with her daughter.  (*See* Mother's Brief, at 13).  She states their recent interactions have been appropriate, with her engaged throughout the visit and bringing food and planned activities.  (*See id.* at 15).  She also maintains that "although there had been somewhat of a hiatus," she has restarted drug and alcohol treatment and parenting classes. (*Id.* at 10).  According to Mother, there was "little presented as to what conclusions may be gleaned from" her recent positive drug screens because Ms. Lawson is not a drug and alcohol professional.  (*Id.* at 15).  She also points to the fact that she maintained employment, has completed the housing program through ARC and would like to continue to apply for housing with the

- 13 -

agency's assistance. (**See id.**). Under the totality of the circumstances, the record does not support Mother's allegation.

We first address the court's termination of Mother's parental rights pursuant to Section 2511(a)(1). **See Int. of K.M.W.**, **supra** at 473. To prove grounds for termination under this section, the movant must demonstrate that the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least six months before the filing of the termination petition. **See id.**; **In re K.Z.S.**, 946 A.2d 753, 758 (Pa. Super. 2008) (same); 23 Pa.C.S. § 2511(a)(1).

> Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

**In re K.Z.S.**, 946 A.2d at 758 (citations omitted).

This Court has held that "[p]arental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support." **In re Adoption of A.C.**, 162 A.3d 1123, 1129 (Pa. Super. 2017) (citation omitted). These physical and emotional needs "cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance." **Id.** (citation omitted). In other words, "[p]arental duty

requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances."

*Id.* (citation omitted).

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*Id.* (citation omitted).[9]

While the critical period for evaluating a parent's conduct is the six months immediately preceding the filing of the TPR petition, a case's whole history remains relevant and courts should "not mechanically apply the six-month statutory provision[.]" *In re C.M.*, 255 A.3d 343, at 364 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1). Finally, "the court should not consider any

_____

[9] Mother cites *In re Adoption of Baby Girl Flemming*, 369 A.2d 1200 (Pa. 1977), for the principle that there must be an "affirmative indication of positive intent" before termination of parental rights can occur. (Mother's Brief, at 13). However, the version of the Adoption Act containing such language has since been repealed and replaced. Any language requiring a movant to prove a parent's "affirmative indication of positive intent" has been replaced by the language that it is the parent who has the positive duty to preserve the relationship by performing her parental duties. *See* 23 Pa.C.S. § 2511(a)(1), Comment (Section 2511(a)(1)) "is derived from Section 1.2 of the 1925 Act which required a finding of abandonment for at least six months as codified in clause (1). However, the grounds for abandonment have been broadened; relinquishment of parental claim or failure or refusal to perform parental duties is now sufficient.").

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

The trial court explains that:

… The record and testimony presented at the two-day Termination Hearing which began on June 27, 2022 and concluded on August 26, 2022 demonstrated Mother's ongoing inability to provide care for or control her Child. Her failure to remedy the conditions that brought the Child into care indicated a continuing disregard of her parental duties. Specifically, Mother failed to provide suitable housing for her Child, submitted multiple urinalysis positive for illegal narcotics, and failed to visit her Child on a consistent basis. The Child was adjudicated dependent in 2020. Since then, Mother refused or proved unable to address her substance abuse issues and never developed a bond with the Child who has never resided with Mother at any point in her life. This was despite constant recommendations from CUA and the trial court to address her substance abuse issues and make positive progress in developing a bond and relationship with the Child.

(Trial Ct. Op., at 9). The record supports the court's conclusion.

DHS filed the TPR petition on June 3, 2022, making December 3, 2021, to June 3, 2022, the most relevant period for Section 2511(a)(1) purposes. However, we cannot mechanically apply this six-month period, as the entire life of the case is relevant.

On December 3, 2021, Child was slightly less than a year-and-a-half old and had been removed from Mother's custody for all but the first two weeks of her life due to both Child and Mother testing positive for oxycodone and fentanyl. (*See* N.T., 6/27/22, at 16). For the life of the case, the court ordered that Mother provide proof of housing and employment to the CUA,

report to the CEU for a drug screen, coordination of random drug screens, treatment monitoring and supervised weekly visitation. (*See id.* at 33). However, the court repeatedly found that Mother's participation and progress were minimal. (*See id.* at 33, 37, 41); (DHS Exhibit 1, at Orders, 6/03/21, 10/06/21, 11/22/21, 2/07/22, 6/27/22). Although consistent visitation and confirmation of treatment and sobriety would have warranted increased visitation, Mother failed to make efforts to move beyond the decreased visitation schedule of two visits per month. (*See* N.T., 8/26/22, at 8-9, 16-21). After the first year of successful visits, the quality and effort Mother put forth with Child regressed, with Mother arriving late, missing visits, failing to pay attention to Child, appearing sluggish, unable to accomplish small tasks for Child such as doing her hair, and electing instead to try to talk with Ms. Williams about her own life. (*See id.* at 8-21). In fact, although Mother originally was granted weekly supervised visits with Child, in November 2021, visitation was reduced to twice per month because of her failure to attend even half of the visits and her overall failure to complete case plan objectives. (*See* Orders, 6/03/21, 11/22/21). Mother then failed to attend any visits with Child in December 2021 or January 2022. While she did attend five of six visits over February and March 2022, she only attended two out of four scheduled visits in May and June 2022, arriving late for them both. (*See* DHS Exhibit 2, Visitation Summary, at 5/03/22 and 6/15/22).

Mother did not appear at the CEU for the four scheduled random drug screens between April 25 and June 1, 2022, blaming it on her work schedule and the fact that she was living with a daughter in Delaware despite having an in-person visit with Child in Philadelphia on June 1, 2022. (*See id.* at Visitation Summary, 6/15/22, entry 6/01/22); (N.T., 6/27/22, at 28-29).

Prior to the filing of the TPR petition, Mother failed to provide information for monitoring of any self-referred drug treatment, with the only information the caseworkers were able to obtain being that she had been discharged from a Temple suboxone maintenance program because it was not medically appropriate and from Merakey for failing to attend. (*See* N.T., 6/27/22, at 60); (N.T., 8/26/22, at 14). While Mother points to the fact that she has returned to drug treatment and started parenting classes, this was a week before the TPR hearing, after the TPR petition was filed, and is not a relevant consideration for our review. (*See* N.T., 6/27/22, at 27). In fact, it bears noting that after she began drug treatment in June 2022, Mother produced positive drug screens on June 27, 2022 (amphetamines and benzodiazepine) and August 10, 2022 (benzodiazepine) despite the drugs not being prescribed. (*See* N.T., 8/26/22, at 31-32). Although she obtained part-time employment as a home health aide and completed housing training with ARC, she did not obtain housing to enable her to care for Child. (*See* N.T., 6/27/22, at 29-32, 45, 61-62).

Based on the foregoing, DHS provided clear and convincing evidence that Mother has failed to complete the objectives set by the court and DHS for reunification, and to perform the parental duties necessary to provide Child with the essential care necessary for her physical and mental well-being. The trial court did not abuse its discretion in finding that DHS presented sufficiently clear and convincing evidence to support termination based on Section 2511(a)(1).

**C.**

Having determined that the court properly found that termination of Mother's parental rights was appropriate under subsection 2511(a)(1), we now consider whether termination is in Child's best interest pursuant to subsection 2511(b).

> With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. It is well settled that intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.

> One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond. The fact that a child has a bond with a parent does not preclude the termination of parental rights. Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.

- 19 -

> It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*Int. of K.M.W., supra* at 475 (case citations and most quotation marks omitted).

Ms. Williams testified that there was no bond between Mother and Child. (*See* N.T., 8/26/22, at 10). Although Child was comfortable with Mother, she was quiet and "just there," and while Child would play with her paternal aunt whom she had just met in April 2022 and would hold Ms. Williams's hand instead of Mother's, her relationship with Mother had not improved. (*Id.* at 10-12, 19). Conversely, Child is "a completely different person with the resource parent," smiling, excitedly interacting and lighting up with her. (*Id.* at 11); (*see id.* at 21-22). When Mother's visit would end, Child would wait at the door looking for her resource parent to see if she could leave. (*See id.* at 21-22). Child treats resource parent's home as her own and hovers around resource parent, who is highly attentive to her. Resource parent provides care and comfort to Child and takes her to doctor's appointments. (*See id.* at 44, 53). Although Child was not talking at the time of the first TPR hearing in June 2022, by August resource parent was taking her for early intervention speech therapy and Child was repeating words resource parent said. (*See id.* at 11, 33-34); (N.T., 6/27/22, at 57-59). Both Ms. Lawson and Ms. Williams testified that Child's primary bond is with resource parent, who is a pre-

adoptive resource. (*See* N.T., 6/27/22, at 54-55, 58-59); (N.T., 8/26/22, at 24). Ms. Lawson stated that terminating Mother's parental rights to allow for the resource parent to adopt Child would not negatively impact her and would be in her best interest. (*See* N.T., 6/27/22, at 52-53, 58-59). Hence, the record supports the trial court's finding that the credible DHS witnesses established that the termination of Mother's parental rights would best serve Child's interest pursuant to Section 2511(b) and we find no abuse of discretion in its decision to terminate Mother's parental rights to Child and to change her goal to adoption.

Decree affirmed.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
Prothonotary

*Date: 3/16/2023*