J-S21004-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 320 MDA 2023 |

Appeal from the Order Entered January 27, 2023
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0200a,
CP-67-DP-000436-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: L.L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 338 MDA 2023 |

Appeal from the Order Entered January 26, 2023
In the Court of Common Pleas of York County Juvenile Division at No(s):
Cp-67-DP-000436-2021

BEFORE:  BOWES, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:　　　　　　　　　**FILED JULY 13, 2023**

---

[*] Retired Senior Judge assigned to the Superior Court.

D.M.M. (Mother) appeals from the orders[1] entered in the Court of Common Pleas of York County (orphans' court) granting the petition filed by the York County Office of Children, Youth & Families (the Agency) to involuntarily terminate her parental rights to L.L.M. (Child) (d.o.b. October 2021) pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(1), (2), (4), (5) and (b), and changing the permanency goal to adoption.[2]  She argues that the orphans' court erred in finding that the Agency provided clear and convincing evidence to support termination and change of goal to adoption. We affirm.

**I.**

**A.**

On December 24, 2021, the Agency received a General Protective Service (GPS) referral alleging that Mother had given the then approximately two-month-old Child Tylenol in her milk.  That day, Mother had brought Child to York Hospital because she "knew" Child was in pain.  Hospital personnel were concerned that drugs may be in the milk Mother brought to the hospital because it was tacky and not smelling like milk or milk with Tylenol.  Although

---

[1] Mother filed separate notices of appeal for the order terminating parental rights and the order changing Child's permanency goal to adoption.  This Court consolidated the cases *sua sponte* on March 10, 2023.  (**See** *Per Curiam* Order, 3/10/23).

[2] The orphans' court also involuntarily terminated the parental rights of unknown father.

Mother told hospital personnel that the maternal grandmother's paramour had physically and/or sexually abused Child, an examination did not reveal any evidence of such abuse. York Hospital took 24-hour custody of Child due to concerns for her welfare.

While at the hospital, Mother was allegedly "all over the place" and assaulted hospital staff. (Application for Emergency Protective Custody, 12/27/21, at ¶ 5). The York City Police Department arrested Mother and she was assessed for a 302 commitment and admitted to Philhaven Mt. Gretna Psychiatric Hospital on December 30, 2021. A criminal investigation of Mother was commenced by the York City Police Department.

On or about December 25, 2021, the Agency received a Child Protective Service (CPS) referral alleging that results of Child's medical testing were positive for cocaine. That day, the Agency filed an application for emergency protective custody because it had concerns for the safety and welfare of Child. The emergency petition averred that Child was ready to be discharged from the hospital and that a foster care placement had been identified. Mother had attempted to identify relative resources for Child, but she knowingly identified a deceased relative and the Agency either was unable to contact the other identified relative resources or they did not respond. The same day, the orphans' court awarded temporary legal and physical custody of Child to the Agency for foster care placement. Child was placed with B.G. and E.G. with whom she continues to reside.

**1.**

After a January 5, 2022 shelter care hearing, the court ordered that it would be in Child's best interest for physical and legal custody to remain with the Agency and that her foster care placement continue. The order further directed that a dependency petition be filed and that supervised visitation be arranged for Mother two times per week for two hours. The court further ordered that a hair follicle be taken from Child and turned over to the appropriate authorities for testinq. (**See** Shelter Care Order, 1/05/22).

On January 6, 2022, the Agency filed the dependency petition for Child and on January 13, 2022, after a hearing, the court adjudicated her dependent. The placement goal was reunification, with a concurrent goal of adoption. The court ordered that Mother shall:

1. Cooperate with AverHealth and undergo drug and alcohol testing;

2. Undergo a Level of Care Assessment and follow through with any and all recommendations;

3. Undergo a drug and alcohol evaluation and follow through with any and all recommendations;

4. Undergo a psychiatric evaluation and follow through with any and all recommendations;

5. Undergo a parenting capacity evaluation;

6. Cooperate with parenting classes and follow through with any and all recommendations;

7. Cooperate with an In-Home Team and follow through with any and all recommendations;

8. Cooperate with MH-IDD and follow through with any and all recommendations;

9. Cooperate with [the Agency] and allow announced and unannounced visits.

(Order of Adjudication and Disposition, 1/13/22, at 3).

**2.**

The April 14, 2022 status review order observed that Mother is cooperative with the Catholic Charities and has supervised visitation with Child two times per week for two hours. Although the visits were appropriate, Mother reported that there was something "wrong" with Child at every visit. She was "hyper-focused on the minor child's vaginal area." (Status Review Order, 4/14/22, at 1). Mother is prepared for visits and brings a lot of items for the foster parents, including diapers, wipes, toys, clothing and shoes. Her visitation appearance was rated as moderate, with her compliance with services as minimum to moderate.

Mother missed some drug screens and on February 18, 2022, she tested positive for cocaine. Mother had an admitted cocaine relapse around March 19, 2022. She completed a drug and alcohol and a psychiatric evaluation through White Deer Run and participated in White Deer Run of York Outpatient Services, but was stepped up to an intensive outpatient (IOP) and there was a possibility at that time that she would be unsuccessfully discharged. She was only at a 37 percent call-in rate for drug and alcohol testing at Averhealth.

Mother's specific goals continued to be finding/maintaining employment, maintaining appropriate housing, developing healthy parenting skills and maintaining sobriety. Her compliance with these goals was rated at minimum to moderate, with her completing a parenting assessment on February 28, 2022. (*See id.* at 1-2).

The April 14, 2022 order also noted that Mother was criminally charged with endangering the welfare of a child (EWOC) on April 6, 2022. A finding of abuse hearing was rescheduled for May 4, 2022. Mother was still on probation from a prior criminal case in Lancaster County, had a warrant for her arrest and was looking at serving time. Child's dependency was continued.

**3.**

A June 9, 2022 permanency review order noted that Mother was in minimal compliance with her goals and was in prison for violation of the probation due to the new EWOC charge, so all services were on hold and, therefore, Mother had made no progress toward alleviating the circumstances which necessitated the original placement. The permanency goal remained reunification, with a concurrent goal of adoption. Child was to remain in foster care. (*See* Permanency Review Order, 6/09/22).

**4.**

The August 17, 2022 status review order noted, in pertinent part, that Mother was released from Lancaster County Prison and was on probation. Although she claimed she was employed full-time at Syncreon, Mother had

not provided any information on employment or financial stability to the Agency as ordered. Mother had found her own housing in Manchester, Pennsylvania. She made minimal progress with Catholic Charities where she was working on healthy coping skills and recognizing healthy relationships. There were concerns with Mother being overly worried about the timeline of progression and Child's vaginal area.

Mother was only sporadically testing with Averhealth; having "no showed" approximately 16 times and was at 69 percent for call-in. She tested positive for marijuana on four separate occasions, although she does not have a medical marijuana card and tested positive for creatine three times. Mother's goal to maintain sobriety was rated as minimum due to the positive testing.

Mother visited with Child two times per week, but missed visits on June 21, June 28 and July 21, 2022, resulting in her being put on an attendance contract on July 21, 2022. Since the attendance contract, Mother consistently attended visits, bringing appropriate snacks for Child.

The order also noted that the hair follicle drug screen for Child had been completed on January 20, 2022, and the test was positive for cocaine at a level in excess of the highest level tested by Averhealth, and she also tested positive for Benzoylecgonine which is a metabolite of cocaine. As a result, the court found that Child was an abuse victim, with Mother as the perpetrator. (*See* Status Review Order, 8/17/22, at 2-3).

**5.**

The November 16, 2022 permanency review order found that Mother was in minimal compliance with the permanency plan and in alleviating the circumstances that led to Child's placement. She changed housing without providing the Agency with a new address, failed to report employment to the Agency, and missed several scheduled drug tests with Averhealth, with the one test that she successfully completed coming back positive for THC. Mother's call-in compliance was 57 percent since the last hearing. Once Justiceworks was added for more consistent testing, Mother refused to test. There were five tests scheduled between the last permanency review hearing and the November 16, 2022 hearing, and she only tested once (on the day of the November hearing) with a positive result for alcohol. She was not compliant with drug treatment.

Mother was inconsistent with attendance at visitation, although she did provide diapers, wipes, extensive clothing, shoes and gifts for Child when she did appear. PA Child opened with Mother September 13, 2022. Since that time, there have been 18 scheduled visits. Nine of them occurred in person, one was held via Zoom and eight were cancelled for Mother's failure to call to confirm the visit despite being aware of this requirement per the visitation contract she had signed. Mother was scheduled for a visit on the day of the permanency review hearing, but she did not call in to confirm.

Mother's intensive family service team through Catholic Charities closed her file due to her non-compliance with their visitation confirmation policy. The permanency review order noted that a November 3, 2022 permanency meeting was held with the family, including Mother, ICPC resource and other family members, but the family was abusive to the caseworker in the meeting. (*See* Permanency Review Order, 11/14/22).

On December 7, 2022, the Agency filed the petition to terminate parental rights. The court held a hearing on January 26, 2023.

## B.

At the termination of parental rights (TPR) hearing, the Agency reunification and permanency caseworker Elyse Nangle, Catholic Charities intensive family services therapist Christianne Brennan, PA Child family advocate Brittany Sunday, PA Child caseworker Valerie Acito, CASA representative Betsy Keefer and foster mother E.G. testified on behalf of the Agency.

## 1.

In addition to the foregoing facts, Ms. Nangle testified that she has been involved with the family since the case's commencement 13 months prior to the TPR hearing.

Ms. Nangle testified that the Agency had offered Mother all services available, and that overall she has not been successful because has not actively and consistently engaged in mental health treatment, did not

complete the parenting capacity evaluation and a drug and alcohol evaluation with a treatment provider but was discharged for non-compliance. She completed a second drug and alcohol evaluation in November 2022 but was inconsistent in drug and alcohol treatment and drug testing. Of the 18 scheduled tests since the last hearing, Mother attended 11 of them and had been no shows for seven. She was at 99 percent call-in compliance so she was aware of the scheduled tests. On February 18, 2022, Mother tested positive for cocaine. On March 15 and 16, 2022, and November 21, 2022, she tested positive for creatine. On July 26, 2022, July 27, 2022, August 10, 2022, August 12, 2022, and September 9, 2022, she was positive for THC despite not having a medical marijuana card.

Ms. Nangle had excused some drug tests for Mother's employment because she provided the Agency with her work schedule that showed she had to work. Mother had told the Agency she worked for Syncreon and for Wolfgang and was doing hair on the side. However, despite Ms. Nangle's repeated reminders to Mother that she had been ordered to provide the Agency with paystubs to prove that she actually worked, she failed to provide them until the last couple of weeks before the TPR hearing.

Mother had not made any child support payments to Domestic Relations or directly to the Child's foster family and was not even in the Domestic Relations system. Mother did not complete the psychiatric or threat of harm evaluations. She had not engaged in court-ordered parenting classes or

trauma therapy and has been inconsistent with visitation because of her failure to confirm the visits pursuant to the visitation contract. Due to her inconsistency and her initial obsession with wiping Child's vaginal area (which had only ended approximately one month before the TPR hearing), Mother's visitation has remained supervised throughout the life of the case. She had started receiving services with Pressley Ridge two weeks before the hearing due to her unsuccessful discharge from Catholic Charities.

Mother has had six different addresses since the January 2021 adjudication. Although Mother kept the Agency informed of the moves, Ms. Nangle stated that Mother has not maintained safe, stable and appropriate housing for her and Child. For example, she had recently moved and there were some major concerns about the new residence because Mother was living with a friend who had a charge in her criminal background that would require a threat of harm evaluation for which the Agency would not pay.

Ms. Nangle noted that Mother was incarcerated from April 2022 to June 2022 for a probation violation. The court had made a finding of abuse against Mother based on the referrals the Agency had received and the investigation into the allegations. Mother's criminal EWOC (Child was the victim) case was still pending at the time of the TPR hearing, but Mother was facing the potential of nine to 16 months' imprisonment if convicted.

When the Agency first received the referrals in December 2021, Mother identified an individual as Child's father. However, after that, she identified

two other gentlemen before finally saying she did not know who Child's father was. No one has come forward as Child's father.

Ms. Nangle observes Child monthly in her foster home. Child is doing extremely well and meeting all milestones with her foster parents, B.G. and E.G., who are a pre-adoptive resource. Child is spoiled and the "apple of the eye in the home." She refers to B.G. and E.G. as mom and dad and is very bonded with them and her ten-year-old foster sister. Mother does provide items like diapers, wipes and clothes when she has visits with Child, had a little birthday party for her and texted on Christmas to see how Child was doing. However, she does not perform any parental duties and, although Child goes to her without issue, Ms. Nangle had not heard Child call her "mom." Ms. Nangle said Child has a stronger parental bond with her foster parents. Ms. Acito observed that Child is comfortable with Mother but could not say if there is a bond. She testified that Child is excited to see the foster family after the visits. Ms. Keefer testified that she has visited Child at her foster home three times and corroborated the testimony that Child is thriving there and is very bonded with her foster parents and foster sister, who is a "little mama" to Child. This testimony was corroborated by E.G. and Child's legal counsel agreed that Child is clearly bonded with her foster parents, very comfortable in their home and considers them her parental figures.

Mother does not engage in any day-to-day care of Child and Ms. Nangle said she was not in a position to obtain physical custody of Child. Ms. Nangle

testified that Mother has not made substantial progress in alleviating the conditions that led to Child's placement because she has not obtained and maintained a suitable home, was not demonstrably employed until right before the TPR hearing, had not gotten mental health treatment and was not addressing her drug and alcohol issues despite being given a reasonable period of time to remedy the conditions that led to Child's removal. Mother had not made diligent efforts toward resuming her parental duties and only worked with some of the services offered by the Agency necessary for reunification.

Ms. Nangle testified that the Agency believed it would be in Child's best interest to terminate Mother's parental rights because consistency and stability are key for Child, which her foster parents have given to her. The Agency recommended that Child's goal be changed to adoption and that she remain with her foster parents, B.G. and E.G.

**2.**

Christian Services caseworker Ms. Brennan testified that they opened services with Mother on February 16, 2022, and she generally met with Mother once per week. The major goals that were originally set for Mother were for her to recognize healthy versus unhealthy relationships and to utilize healthy coping skills for anger and depression. Steps of the goal also included addressing drugs and alcohol. Mother's compliance was minimal to moderate with her therapeutic goals rated as minimal.

Although Mother's attendance was good at Christian Services, she had started the IOP with another treatment agency and her compliance on the drugs and alcohol issues was moderate. She addressed Mother's March positive test result for cocaine with her and Mother acknowledged the positive test. Ms. Brennan stated that Mother would benefit from continued drug and alcohol therapy and therapeutic mental health therapy due to her trauma history. Although Mother has been open and honest with Ms. Brennan, addressing underlying trauma has been a struggle.

**3.**

Family advocate Brittany Sunday was working with Mother on her goals to find and maintain employment, maintain appropriate housing, learn effective parenting skills, utilize community resources and maintain sobriety. She described Mother's employment progress as minimal to moderate, her efforts to obtain and maintain appropriate housing as moderate, and parenting skills goal was minimal to moderate. Although Mother is more open to visitation suggestions from Ms. Sunday, she was hyper-focused on concerns about Child's vaginal area until approximately a month before the hearing.

Ms. Sunday testified that Mother's progress with visitation is minimal to moderate, with her coming prepared to visits bringing diapers and toys and interacting with Child. She said that Mother was making some progress at maintaining sobriety because, although she did test positive for drugs, she was honest with the treatment agency and had started the IOP with them.

Ms. Sunday testified that Mother started working at Syncreon at the end of March, but she was unsure if she still worked there at the time of the TPR hearing. When questioned by the court, Mother said that she is still employed at Sycreon and that they told her she will have a job there after she gets out of jail if she is convicted of EWOC.

At the conclusion of the January 26, 2022 hearing, the court found clear and convincing evidence to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8) and 23 Pa.C.S. § 2511(b).

Mother timely appealed and filed a contemporaneous Rule 1925(b) statement. *See* Pa.R.A.P. 1925(a)(2)(i). She argues that she was making reasonable efforts to utilize the Agency's services, is forming a bond with Child and that she has alleviated the circumstances that gave rise to Child's removal. (*See* Mother's Brief, at 9).[3]

---

[3] We review the orphans' court's order for an abuse of discretion. *See In re G.M.S.*, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *In re Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re A.S.*, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id.*

## II.

It is well-settled that the party seeking termination must provide clear and convincing evidence to do so. *See In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). "Clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and brackets omitted). The court terminated Mother's parental rights pursuant to Section 2511(a)(1),(2), (4), (5) and (b) of the Adoption Act. However, "[w]e need only agree with [the trial court's] decision as to any one subsection of Section 2511(a) and subsection (b) in order to affirm the termination of parental rights." *Int. of K.M.W.*, 238 A.3d 465, 473 (Pa. Super. 2000) (citation omitted).

We conclude that the orphans' court correctly determined that the Agency met its burden of proof pursuant to subsections 2511(a)(2) and (b), which provide:

> **(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

### A.

Mother argues that the evidence was not clear and convincing that she has not or will not accomplish the goals for reunification. She maintains that the ground for removal was her use of cocaine, which she was remedied since her last positive drug test for cocaine was in February 2022. (*See* Mother's Brief, at 12-13). Furthermore, she argues that there was a concern about her hypersensitivity to Child's vaginal area when wiping, which was no longer an issue by the time of the TPR hearing. (*See id.* at 13). Finally, she maintains that she has been in drug and alcohol treatment since November 2022. (*See id.*).

We first address the court's termination of Mother's parental rights pursuant to Section 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity,

- 17 -

abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties.

*In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021), *appeal denied*,

258 A.3d 1144 (Pa. 2021) (citations and quotation marks omitted).

This Court has held that "[p]arental duty is best understood in relation

to the needs of a child. A child needs love, protection, guidance, and support."

*In re Adoption of A.C.*, 162 A.3d 1123, 1129 (Pa. Super. 2017).

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*Id.* (citation omitted).

The orphans' court explains that:

[C]ocaine being found in Mother's system and in L.L.M.'s system is what gave rise to the dependency case. And, Mother had last tested positive for cocaine on February 18, 2022, which was almost a year prior to the change in goal to adoption. [However,] Mother had tested positive multiple times for THC (having no medical marijuana card) and as recently as September of 2022. Moreover, Mother tested positive for creatine more than once. And, finally, while Mother had a ninety-nine percent compliance with calling in and attended eleven drug tests, Mother also had seven no-shows for drug testing. Stated differently, when it came to showing up for actual drug testing, Mother failed to present for testing 39% of the time. It is difficult to detect drugs, especially cocaine, when a person does not submit to 40% of the testing. Even if Mother had successfully conquered cocaine, which the Court does not believe occurred given Mother's failure to present for testing 39% of the time in the testing period immediately prior

- 18 -

to termination coupled with her multiple positives for creatine over the course of testing and as recently as November 21, 2022, L.L.M. was removed from Mother's care due to drugs yet Mother continued to use the illicit substance of THC for which she had no medical marijuana card. Given the genesis and history of the case, Mother's history of not showing up for drug testing up until the termination hearing, coupled with all of Mother's other failures, combined with the fact that L.L.M. had already been in placement for going on thirteen months, compelled the Court to conclude that more time would not have permitted Mother to remedy any of the myriad causes of removal.

We note that, "the focus of dependency proceedings is on the children's safety, permanency, and well-being—not on Mother's conduct." **In re N.C.**, 2006 PA Super 285, 909 A.2d 818, [824] (Pa. Super. 2006) (citations omitted). Mother had almost thirteen months to demonstrate that she had remedied the causes of removal. More time would not have benefitted Mother and focusing on the best interests of the child, L.L.M.'s need for permanency did not allow for any more time to be granted to Mother to remediate the cause of removal. …

(Orphans' Ct. Op., at 21-22) (emphasis in original). The record supports the court's conclusion.

The Agency filed the initial application for emergency protective custody in December 2021 due to then two-month-old Child and Mother testing positive for cocaine. Child was adjudicated dependent in January 2022 and has remained dependent since that time, with her being out of Mother's custody for approximately 13 months and living with the same foster parents, B.G. and E.G., at the time of the TPR hearing. Mother's goals for reunification were established at the January 13, 2021 dependency proceeding and have remained the same throughout the life of the case. (**See** Order of Adjudication and Disposition, 1/13/21, at 3); (N.T. Hearing, at 55-57). Despite being

provided with all available Agency services, Mother continued to be unable to address the circumstances that brought Child into the Agency's care, exhibiting a repeated and continued refusal to provide for Child's physical well-being. (*See* N.T. Hearing, at 61-62). Her compliance with her reunification goals of remedying her substance abuse issues, obtaining stable housing, providing a verifiable income source (until immediately before the hearing) and attending trauma therapy were rated as minimal to moderate throughout the life of the case despite the Agency providing her with all available services. (*See* Status Review Order, 4/14/22); (Permanency Review Order, 6/09/22); (Permanency Review Order, 8/17/22, at 2-3); (Permanency Review Order, 11/16/22, at 2-3); (Status Review Order, 1/26/23, at 2-3); (N.T. Hearing, at 55-57, 61-62).

Specifically, Mother only attended 11 of the 18 drug tests scheduled between November 11, 2022, and January 26, 2023, despite being aware of when she was scheduled for testing. (*See* N.T. Hearing, at 6, 7, 19, 55, 62). Although we agree with Mother that she last tested positive for cocaine on February 18, 2022, over the course of the year, she failed to comply with her reunification goals that she remain drug-free and complete drug and alcohol testing. She tested positive for marijuana six times and for creatine three times. (*See id.* at 7, 62-63). Mother was unsuccessfully discharged from drug and alcohol treatment at White Deer Run and had not completed the

program at Colonial House by the time of the termination hearing. (*See* N.T. Hearing, at 56).

Additionally, Mother failed to provide paystubs supporting her claims of employment until approximately two weeks before the TPR hearing. (*See id.* at 7-8, 60). She did not obtain the necessary evaluations regarding her mental health, nor did she follow through with parenting classes or trauma therapy. Her compliance with Christian Services' therapeutic goals of recognizing healthy versus unhealthy relationships, utilizing healthy coping skills for anger and depression and addressing drugs and alcohol issues was minimal to moderate, and she was unsuccessfully discharged from the Catholic Charities in-home team and started with Pressley Ridge two weeks prior to the TPR hearing. (*See id.* at 9, 13, 56).

Mother's visitation with Child has been inconsistent due to her failure to call in to confirm the visits and they remained supervised throughout the life of the case due to her inconsistency. (*See id.* at 8, 56-57, 61). Mother did not provide for Child's day-to-day care or provide financial support for Child's placement. (*See id.* at 60-61, 64-65). While we are aware that Mother provided personal care items and toys for Child at her visits with Child and attends doctor appointments, as observed by the court, this is not fulfilling her parental duties of providing care and control of Child.

According to Ms. Nangle, Mother did keep the Agency apprised of her address whenever she moved, but she has failed to maintain safe, stable and

appropriate housing for her and Child, with her latest residence being with a friend who had a prior criminal charge that required a threat of harm evaluation. (*See id.* at 10, 59-60). Family advocate Ms. Sunday described Mother's employment progress as minimal to moderate, her efforts to obtain and maintain appropriate housing as moderate and parenting skills goal as minimal to moderate. (*See id.* at 19-20). Finally, Mother's criminal charges remained outstanding, the projected sentence of which would leave Child without her parent for at least another nine to 16 months following Mother's sentencing. (*See id.* at 11, 58).

Based on the foregoing, the Agency provided clear and convincing evidence that Mother has failed to complete the objectives set by the court and the Agency for reunification, and that this continued refusal has caused Child to be without essential parental care that will not be reasonably and promptly remedied . The orphans' court did not abuse its discretion in finding that the Agency presented sufficiently clear and convincing evidence to support termination based on Section 2511(a)(2).

### B.

Having determined that the court properly found that termination of Mother's parental rights was appropriate under subsection 2511(a)(2), we now consider whether termination is in Child's best interest pursuant to subsection 2511(b).

> With respect to Section 2511(b), our analysis focuses on the
> effect that terminating the parental bond will have on the child.

In particular, we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. It is well settled that intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond. The fact that a child has a bond with a parent does not preclude the termination of parental rights. Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.

It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*Int. of K.M.W.*, *supra* at 475 (case citations and most quotation marks omitted).

At the hearing, the orphans' court observed:

To the extent that there is a bond between mom and [Child], I think it's a comfortable bond in that she knows you, but I don't think that it rises to the level of a full parental bond. I think the parental bond that [Child] has by the uncontroverted testimony in this case is that she is fully and complete[ly] bonded as Mother and Father with [E.G. and B.G.] and she's fully bonded and integrated into that family.

I think when it comes to having [Child] in a home, specifically her home, she's already there. So that is - to even compare those two and put them on the same scale, I don't think is accurate. I think there is a bond that [Child] has with the [foster family] that's the parental bond. I believe there is a familiarity bond with … biological Mother.

- 23 -

(N.T. Hearing, at 94-95). The record supports the orphans' court's observation.

Ms. Nangle testified that she observes Child monthly in her foster home where she is doing extremely well and meeting all milestones. (*See* N.T. Hearing, at 63). Child refers to her foster parents as mom and dad and is very bonded with her ten-year-old foster sister. (*See id.* at 63-64). Although Child would go to Mother without issue, she did not refer to Mother as "mom" and Ms. Nangle stated that Child had a stronger bond with her foster parents. (*See id.* at 67). Ms. Acito stated that it is not clear that Child has any bond with Mother, although Child appears to be comfortable with her. (*See id.* at 23). She testified that Child was excited to see her foster family after returning from visitation with Mother. (*See id.* at 24). CASA representative Ms. Keefer corroborated the testimony that Child is thriving and is obviously very bonded with her foster parents and foster sister. (*See id.* at 83-84). Ms. Nangle testified that termination of parental rights to free Child for adoption would be in Child's best interest because she needs the consistency and stability that the foster family has given her. (*See id.* at 66).

Hence, the record supports the orphans' court's finding that the Agency witnesses established that the termination of Mother's parental rights would best serve Child's interest pursuant to Section 2511(b) and we find no abuse

of discretion in its decision to terminate Mother's parental rights to Child and to change her goal to adoption.[4]

_____

[4] The Supreme Court's recent case, **Interest of K.T.**, --- A.3d ---, 2023 WL 4092986 (Pa. filed June 21, 2023), further bolsters our disposition. **K.T.** re-emphasized the "pivotal language" of Section 2511(b) which "clearly mandates" that courts "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. ... This of course requires the court to focus on the child and consider all three categories of need and welfare." **K.T.**, --- A.3d at ---, 2023 WL 4092986 at *13. In doing so, **K.T.** specifically directs courts "to consider the matter **from the child's perspective**, placing her developmental, physical, and emotional welfare **above concerns for the parent**." **Id**. (citation omitted; emphases added). It further noted that courts considering an involuntary termination petition "must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years and we have an obligation to see to their healthy development **quickly**. **Id**. --- A.3d at ---, 2023 WL 4092986 at *15 (citation omitted; original emphasis).

**K.T.** also emphasized that when it examines whether termination of parental rights "will destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences," **Id**. --- A.3d at ---, 2023 WL 4092986 at *16 (quotation marks and citation omitted), the court is able to properly prioritize the child's needs:

> [B]y evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain.

**Id**.

**K.T.**'s emphasis on a child's development and mental and emotional needs over her "feelings" or "affection" toward her natural parent offers further support for the involuntary termination of D.M.M.'s parental rights. Although Child has exhibited some positive feelings for Mother, the termination will not destroy a necessary and beneficial relationship, resulting in Child suffering extreme emotional consequences. The testimony was consistent that Child's

*(Footnote Continued Next Page)*

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/13/2023

---

developmental, physical and emotional welfare will best be served by her foster parents with whom she is bonded and who provide her with the permanency and security necessary for her to thrive.